**E-Filed 4/17/2013**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| HAIPING SU, | CASE NO. 5:09-cv-02838-EJD |
| Plaintiff, | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| v. | |
| NATIONAL AERONAUTICS AND SPACE ADMINISTRATION, ET AL., | [Re: Docket Item No. 193] |
| Defendants. | |

Defendants seeks summary judgment with respect to Plaintiff's corrected consolidated complaint. Having considered the briefing, the admissible evidence, and the oral argument presented at the hearing, the Court hereby grants the motion in part and denies it in part.

**I. BACKGROUND**

Plaintiff Haiping Su ("Su") is an American citizen of Chinese ethnicity. Administrative Record ("AR") 5, ECF No. 108-2. He received a doctorate from Kansas State University, and works in the field of earth sciences. *Id*. at 34, 84. The Federal Bureau of Investigation ("FBI") opened an investigation on Su in 2003; at that time he worked at Edwards Airforce Base, at the National Aeronautics and Space Administration ("NASA") Dryden Flight Research Center. *Id*. at 80. Subsequently, Su obtained a position as a staff scientist for the University of California, Santa

Cruz ("UCSC"), working on a NASA contract through the University Affiliated Research Center ("UARC"). *Id*. at 84; *see also* Su Dep. 37:13-19, ECF No. 201-1. The UARC team worked at the NASA Ames Research Center, AR 84, and in effect was "embedded" in the Earth Sciences Division at NASA Ames, Myers Dep. 64:17-65:14, ECF No. 202-1. Su's immediate supervisor at UARC was Jeff Myers ("Myers"); above Myers was Larry Hogle ("Hogle"); and above Hogle was Jim Berry ("Berry"), the director of UARC. Su Dep. 38:6-22, ECF No. 201-1.

**FBI/NASA Joint Investigation**

In 2006, the FBI contacted the NASA Ames Research Center's Counterintelligence Office to request that the two agencies conduct a joint investigation of Su. AR at 82-83; ECF No. 108-2. FBI and NASA agents jointly interviewed Su on February 14, 2008 and March 12, 2008. *Id*. at 84. On March 21, 2008, Su underwent a consensual polygraph examination. *Id*. at 85. On May 22, 2008, the FBI sent a letter to NASA, stating among other things that "[t]he results of this examination are indicative of deception" and that "there is a reasonable belief that Su may present a threat to national security." *Id*. The letter advised that, "It is recommended that NASA independently consider taking precautionary measures regarding Su's access to the U.S. Government facility and information in order to address existing security concerns that Su has been unwilling to clarify." *Id*.

**June 24, 2008 Debarment Letter**

By letter dated June 24, 2008 ("debarment letter"), Robert Dolci ("Dolci"), NASA Ames's Chief of Protective Services, informed Su that his access privileges to the NASA Ames Research Center were revoked. AR 81, ECF No. 108-2. The letter stated that, "This order is made pursuant to NASA Procedural Requirement (NPR) 1600.1, Section 1.4.1.[1] based upon a determination that your continued presence on NASA property constitutes a security risk." *Id*. Ken Silverman

---

[1] Section 1.4.1 provided that:

Center Directors, Headquarters Operations Director, the AA/OSPP, the DSMD, or the CCS, shall order the removal or debarment of any person who violates NASA Security requirements or whose continued presence on NASA property constitutes a security or safety risk to persons or property. Any determinations to reconsider granting access subsequent to the removal action must receive the concurrence, in writing, of the AA/OSPP.

NPR 1600.1, § 1.4.1 (2005), ECF No. 88-1.

("Silverman"), NASA Ames's Chief of Security, delivered the letter to Su at 2:00 p.m. on June 24, 2008. *Id*. Su was escorted from the premises by Silverman and another security employee. Su Dep. 83:7-84:10, ECF No. 193-2. Dolci called Hogle, one of Su's UARC supervisors, to inform him that the debarment letter was issuing. Dolci Dep. 174:2-175:8, ECF No. 193-2. Dolci also directed Silverman to give a copy of the letter to Berry, the Director of UARC. *Id*. at 173:4-21. Silverman gave a copy of the letter to Hogle with the request that it be passed on to Berry. Hogle Dep. 81:1-6, ECF No. 204-1. Hogle does not recall any instruction to keep the letter confidential. *Id*. at 81:7-14. Hogle told Myers, Su's direct supervisor at UARC, about the debarment letter. *Id*. at 81:20-22. Hogle also emailed a copy of the letter to Stephen Hipskind ("Hipskind"), Chief of the Earth Sciences Division at NASA Ames. Hipskind Dep. 78:20-79:11, ECF No. 193-2.

**July 3, 2008 Staff Meeting**

Hipskind informed Dolci that the Earth Sciences staff was concerned about Su's removal and requested that Dolci hold a meeting to discuss the situation. Dolci Dep. 205:8-17, ECF No. 203-2. On July 3, 2008, Dolci met with a number of NASA and UARC employees who had worked with Su in the Earth Sciences Division. *Id*.

Witnesses' accounts of this meeting differ. Myers testified that approximately thirty people attended, including ten to fifteen UARC employees. Myers Dep. 66:17-67:3, ECF No. 202-1. Myers recalls that Dolci said that it had been determined that Su was a security risk and that he no longer would be allowed on the NASA Ames campus. *Id*. at 68:4-9. Myers stated that Dolci did not give any further details. *Id*. at 68:21-24. However, Myers testified that when a number of Chinese-born employees in the Earth Sciences Division asked how they could ensure that they did not suffer Su's fate, Dolci responded something to the effect of, "Don't accept money from another government and then deny it." *Id*. at 69:9-19. One of Su's UARC colleagues, Bruce Coffland ("Coffland"), recalled Dolci saying that Su's debarment was justified by an investigation indicating that Su posed a security risk. Coffland Dep. 38:5-10, ECF No. 201-2. Coffland believed that there was a general awareness among the individuals at the meeting that Su had undergone a polygraph examination, and thought that Dolci might have mentioned the polygraph at the July 3 meeting. *Id*. at 38:11-39:21, 63:17-64:10. Coffland recalled comments about not accepting money from another

3

CASE NO. 5:09-cv-02838-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SJ

government, but he thought the comments had been made by Hipskind rather than Dolci. *Id*. at 41:14-23. Hogle had no recollection at all of comments regarding not accepting money from foreign governments. Hogle Dep. 144:19-145:4, ECF No. 204-1.

Dolci testified that approximately fifteen to twenty people attended the meeting. Dolci Dep. 206:5-6, ECF No. 203-2. He had no recollection of stating that Su was considered a security risk; to the contrary, he recalled being asked something along the lines of whether Su was a security risk, and responding that he could not discuss that issue. *Id*. at 207:19-209:1. He expressed disbelief that he would have said that Su had lost access because he was a security risk, stating that, "That would have been incredibly foolish of me. I didn't need to say that." *Id*. at 208:5-8. Dolci also denied mentioning the polygraph or the FBI, or saying that one way to avoid Su's fate was not to take money from a foreign government. *Id*. at 242:14-25.

**Su's Employment Post-Debarment**

On July 3, 2008, Myers sent Su a Notice of Intent to Terminate. Letter of July 3, 2008, ECF No. 199-7. Myers stated that, "The reason for the termination is that your access to the NASA Ames facility has been revoked and, in order for you to perform your responsibilities according to the needs of the research task, an access badge is required." *Id*. On July 17, 2008, Myers sent Su a Rescindment of Notice of Intent to Terminate. Letter of July 17, 2008, ECF No. 199-8. In that letter, Myers stated that "it has been determined that you will be able to continue to work from an alternative work site via a UARC telecommuting agreement." *Id*. The telecommuting agreement initially was valid through September 14, 2010, but subsequently it was renewed through September 15, 2013. Agrmts., ECF No. 193-2.

Su did not suffer any break in pay or loss of earnings. Su Dep. 214:18-215:3, ECF No. 193-2. He has not lost any employment-related benefits. *Id*. at 216:12-217:1. He has continued to receive annual merit increases, excellent performance evaluations, and awards for his work. *Id*. at 204:20-207:12. He believes that his colleagues continue to hold him in high regard. *Id*. at 206:21-207:23. However, he has suffered ongoing mental and emotional distress: he loses concentration, he has begun grinding his teeth, he gets headaches, and he drinks more coffee. *Id*. at 225:4-228:14. He worries that he would have difficulty finding a new job because of damage to his reputation. *Id*.

4

at 203:24-204:15.  However, Su has not applied for any other jobs since his debarment.  *Id*.

**The Present Lawsuit**

Su filed this lawsuit on June 24, 2009, asserting *inter alia* claims under the Administrative Procedure Act ("APA") and the Fifth Amendment of the United States Constitution; those claims were based upon alleged violations of Su's due process rights with respect to his debarment from NASA Ames.  Compl. at ¶¶ 60-86, ECF No. 1.  He also asserted violations of his privacy rights as protected by the federal Privacy Act, 5 U.S.C. § 552a, the United States Constitution, and the California Constitution.  *Id*. at ¶¶ 87-104.  The Court dismissed the Fifth Amendment claim and granted summary judgment for Defendants with respect to the APA claim.  Order of Dec. 16, 2009, ECF No. 63; Order of June 16, 2010, ECF No. 122.  Thus the validity of the process by which Su was debarred from NASA Ames is no longer at issue in this lawsuit.

On January 15, 2010, Su filed a separate action arising out of the same facts, asserting a claim under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680, based upon alleged violation of his privacy rights as protected by the California Constitution.  Compl. in Case No. 5:10-cv-00222, ECF No. 1.  The Court ultimately consolidated the two actions.  The operative Corrected Consolidated Complaint ("Consolidated Complaint") asserts three claims:  (1) a claim against Dolci and other NASA officials (in their official capacities) for violation of the Privacy Act; (2) a claim against Dolci and other NASA officials (in their official capacities) for violation of informational privacy rights under the United States Constitution; and (3) a claim against the United States under the FTCA based upon violation of privacy rights protected by the California Constitution.  Consol. Compl., ECF No. 127-1.  Su seeks a name-clearing hearing; injunctive relief; damages; and attorneys' fees and costs.  *Id*.

## II. LEGAL STANDARD

"Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Samuels v. Holland Amer. Line-USA Inc.*, 656 F.3d 948, 952 (9th Cir. 2011) (citing Fed. R. Civ. P. 56(a)).  "In considering a motion for summary judgment, we must draw all reasonable inferences in favor of the nonmoving party." *Id*.  "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a

5

jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).

### III. DISCUSSION

**A.  First Claim for Violation of the Privacy Act**

"The Privacy Act of 1974, codified in part at 5 U.S.C. § 552a, contains a comprehensive and detailed set of requirements for the management of confidential records held by Executive Branch agencies." *Fed. Aviation Admin. v. Cooper*, 132 S.Ct. 1441, 1446 (2012). The Act provides that "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains" unless certain exceptions apply. 5 U.S.C. § 552a(b). If an agency fails to comply with the Act's requirements "in such a way as to have an adverse effect on an individual," the individual may bring a civil action against the agency. 5 U.S.C. § 552a(g)(1)(D). If the agency's failure to comply is "intentional or willful," the United States may be liable to the individual for "actual damages" as well as reasonable attorneys' fees and costs. 5 U.S.C. § 552a(g)(4).

Su claims that Defendants improperly communicated to third parties "records about Dr. Su purportedly related to defendants' determination that Dr. Su is a 'security risk.'" Consol. Compl. ¶ 92. Su's briefs and oral argument flesh out this claim, asserting that Dolci[2] disclosed a number of facts from protected records generated during the FBI-NASA investigation. *See, e.g.,* Pl.'s Opp'n at 12-14, ECF No. 194. Specifically, Dolci allegedly disclosed to Su's superiors and colleagues at UARC that he was a security risk and that he had failed a polygraph examination. *Id*. Dolci also allegedly implied that Su had taken money from a foreign government.[3] *Id*.

---

[2] Although the Privacy Act claim is asserted against a number of NASA officials besides Dolci, the record evidence does not show that any other officials made the disclosures about which Su complains.

[3] Su's brief asserts that Dolci disclosed other facts from the investigative records as well, for example, that Su's debarment was based upon something that happened during his previous employment at another facility. *See* Pl.'s Opp'n at 13, ECF No. 194. However, the parties' briefs focus on disclosures relating to Su's status as a security risk, the polygraph examination, and taking

6

CASE NO. 5:09-cv-02838-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SJ

The elements of a disclosure claim under the Privacy Act are: (1) the information is covered by the Act as a "record" contained in a "system of records"; (2) the agency disclosed the information improperly; (3) the disclosure had an adverse effect on the plaintiff; (4) the disclosure was willful or intentional; and (5) the plaintiff suffered actual damages. *Stafford v. Social Sec. Admin.*, 437 F. Supp. 2d 1113, 1117 (N.D. Cal. 2006); *see also Quinn v. Stone*, 978 F.2d 126, 131 (3d Cir. 1992).

Although Defendants initially disputed whether the information in question had been retrieved from protected records and whether Dolci made the statements attributed to him, *see* Defs.' Br. at 14-16, 18-19, ECF No. 193, Defendants' counsel conceded these points at the hearing for purposes of this motion only, Hrg. Tr. at 48-49, ECF No. 208. Oral argument focused in large part on whether the disclosures fall within exceptions to the Privacy Act's disclosure bar, whether the disclosures had an adverse effect on Su, whether the disclosures were willful or intentional, and whether Su suffered actual damages as a result of the disclosures.

After the hearing, the United States Supreme Court issued its decision in *Fed. Aviation Admin. v. Cooper*, addressing the "actual damages" element of a Privacy Act claim. *Cooper*, 132 S. Ct. at 1446. As relevant here, the Court distinguished between "general damages," which cover "loss of reputation, shame, mortification, injury to the feelings and the like," and "special damages," which are limited to "actual pecuniary loss." *Id*. at 1451. The Court concluded that the term "actual damages" as used in the Privacy Act is synonymous with "special damages." *Id*. at 1452-53. Accordingly, the term "actual damages" is "limited to proven pecuniary or economic harm." *Id*. at 1453. The Court held expressly that in drafting the Privacy Act, "Congress foreclosed recovery for nonpecuniary harm, even if such harm can be proved, and instead waived the Government's sovereign immunity only with respect to harm compensable as special damages." *Id*. at 1454. This Court vacated its order of submission and requested that the parties submit supplemental briefing on the effect, if any, of *Cooper* on Defendants' motion for summary judgment. Order of March 30,

---

money from a foreign government. Accordingly, this order focuses on those disclosures as well. Discussing additional disclosures would not alter the Court's analysis.

2012, ECF No. 211.

This Court concludes that, in light of *Cooper*, the "actual damages" element is dispositive of Su's Privacy Act claim.[4] Su's supplemental briefing addressing *Cooper* was accompanied by the Supplemental Declaration of Michael Reedy. *See* Supp. Dec. of Michael Reedy, ECF No. 215. Attached to that declaration is a copy of Su's supplemental damages disclosures, identifying his claimed damages as follows:

> 1. All special and general damages for personal injuries and economic losses suffered by plaintiff as a result of and in connection with the defendants' conduct, which are continuing to accrue and which amounts are listed below, including but not limited to the following:
>
> > a. Economic losses and/or damages, other than loss of income, wages, and benefits, that have been suffered or will be suffered as a result of defendants' wrongful conduct in violating plaintiff's constitutional rights and plaintiff's rights under California law, including but not limited to, (1) damages caused to plaintiff's professional reputation, which constitute general damages that are to be determined by the trier of fact, but which are estimated to be at least $500,000, and (2) damages suffered when plaintiff's work under the UARC contract was reduced to half-time, requiring him to accept work at the University of California at Davis and to incur work-related expenses of approximately $4,466.00, as documented in materials produced in plaintiff's supplemental document production (see P01738-P01742);
>
> > b. Emotional distress that has been suffered or will be suffered as a result of the defendants' wrongful conduct in violating plaintiff's constitutional rights and plaintiff's rights under California law, including but not limited to, emotional distress caused by defendants' unlawful invasion of plaintiff's privacy, which constitute general damages that are to be determined by the trier of fact, but which are estimated to be at least $1,000,000.00;
>
> > c. Lost income, wages, and benefits that have been suffered or will be suffered as a result of defendants' wrongful conduct described above, which are estimated to be an amount not exceeding $2,835,842.00 for lost wages, as documented in materials produced in plaintiffs supplemental document production (see P01737), and potential lost pension benefits with a cash out value estimated in an amount not exceeding $1,244,649 (see P01744-P01753);
>
> > and
>
> > d. Pain and suffering that have occurred or will occur as a result of defendants' wrongful conduct described above, which constitute general damages that are to be determined by the trier of fact, but which are estimated to be at least $1,000,000.00.

---

[4] Because the "actual damages" element is dispositive, the Court need not address the remaining disputed elements of Su's Privacy Act claim.

8

CASE NO. 5:09-cv-02838-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SJ

 2. All attorney's fees and costs incurred in this action, which are continuing to accrue and which totaled approximately $858,187.50 in attorney's fees and $40,731.15 in costs as of March 14, 2011.

Pl.'s Third Supp. Init. Discl., ECF No. 215. Once Su's claims for general damages are excluded, his claims for potentially recoverable damages are limited to (1) expenses arising from his assignment to a project at the University of California, Davis ("UC Davis") and (2) future lost wages and benefits.[5]

Su claims that his work for UARC was reduced by at least fifty percent in connection with Dolci's wrongful disclosures. Consol. Compl. ¶ 66, ECF No. 127-1. He claims that he was able to continue to receive a full paycheck only because UCSC arranged for him to work on another, unrelated project at UC Davis. *Id.* at ¶ 67. He complains that he has not been reimbursed for the costs of his weekly commute to UC Davis (which is approximately 100 miles from his former work-site at NASA Ames), including gas, wear on his car, and bridge tolls. *Id.* at ¶ 71. He submits a statement that these costs total $4,466.00. Stmt. Concerning Costs, ECF 204-3.

Su has not presented any evidence that his change in job duties and resulting commute costs resulted from Dolci's *disclosures* regarding the reasons for his debarment rather than the *debarment itself*. *See Houlihan v. Office of Pers. Mgmt.*, 909 F.2d 383, 384 (9th Cir. 1990) ("An individual bringing a claim under the Privacy Act must demonstrate a 'causal connection' between the alleged violation of the Act and the harm suffered by the individual."). To the contrary, it appears that Su's supervisor, Myers, initially concluded that Su would not be able to perform his job duties because

---

[5] Su's supplemental brief suggests that Su suffered additional special damages arising from "treatments for teeth grinding and headaches," citing to his response to an interrogatory asking him to describe each of his physical and mental injuries. Pl.'s Supp. Br. at 4, ECF No. 214. Su's response to that interrogatory stated that, "No severe physical injuries have appeared at this time, but the experiences detailed in the Consolidated Complaint and other pleadings filed by plaintiff in this action have been stressful for both him and his family." Pl.'s Resp. to Defs.' First Set of Interrogs., Interrog. No. 15, ECF No. 215. The response goes on to describe teeth grinding and headaches as symptoms of the stress suffered by Su. *Id.* The response gives no indication that Su claims the cost of treatment for teeth grinding and headaches as damages in this action. *Id.* It appears from Su's deposition testimony that the only treatment prescribed for teeth grinding was a night guard, and that no special treatment was prescribed for headaches; Su took Tylenol as needed. Su Dep. 223:4-12, 225:6-13, ECF No. 193-2. Su has not submitted any further evidence or argument regarding the night guard or its cost. The Court concludes that Su's passing references to teeth grinding and headaches as symptoms of stress are insufficient to create a triable issue as to whether he suffered pecuniary harm as a result of the alleged Privacy Act violation.

9
CASE NO. 5:09-cv-02838-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SJ

he no longer had access to NASA Ames. Letter of July 3, 2008, ECF No. 199-7. Myers later determined that Su could continue his employment despite his lack of access, arranging for Su to work from home on the UARC contract and at UC Davis on another project. Letter of July 17, 2008, ECF No. 199-8; Myers Dep. 73:17-76:19, ECF No. 193-2. Myers thought that placing Su at UC Davis was a good idea because it was unclear whether NASA was going to request that Su be removed from the UARC contract entirely. Myers Dep. 76:13-19. Myers thought the UC Davis placement was "a good opportunity for him to broaden out with some other opportunities within the UC system of where he was already an employee." *Id*. at 76:16-19. Based upon this record, no reasonable trier of fact could conclude that Su's change in job duties and placement at UC Davis resulted from Dolci's disclosures of the reasons for Su's debarment rather than the actual debarment itself.

Su also claims that as a result of disclosures regarding the reasons for his debarment, he would not be able to obtain another position if his employment were terminated. He projects that he would lose up to $2,835,842.00 between the date of termination from his current job and a retirement age of sixty-seven. Pl.'s Second Supp. Resp. to Defs.' First Set of Interrogs., Interrog. 14, ECF No. 204-3. He also projects that if he lost his current job he would lose up to $1,244,649 in pension benefits. Stmt. Concerning Potential Pension Losses, ECF No. 204-4.

Su admittedly has not suffered any break in pay, reduction in pay, or reduction in employment-related benefits to date. Su Dep. 214:18-217:1, ECF No. 193-2. He has continued to receive annual merit increases, excellent performance evaluations, and awards for his work. *Id*. at 204:20-207:12. He has not applied for any other position. Su Dep. 203:24-204:15, ECF No. 193-2. Accordingly, it appears that Su is engaging in mere speculation when he projects losses that he might incur *if* he were to lose his job and *if* he were unable to obtain another job.

Su relies on the deposition testimony of a vocational expert, Michael Graham ("Graham"), to support his projected loss of earnings and pension benefits. *See* Graham Dep., ECF No. 215. Graham's testimony is problematic. First, Graham assumes that the NASA/UARC contract will expire in 2013 and that as a result Su will lose his job in 2013. *Id*. at 162:9-164:21. Graham ignores the facts that Su's supervisor, Myers, has been working on an iteration of the NASA/UARC contract

10

for thirty-five years and that it is entirely possible that the contract will be rebid and continue to exist. *Id*. at 162:15-163:10. More importantly, however, Graham makes clear that his "assignment was to, again, look at the *impact of this debarment* on Dr. Su's potential employability, placeability if he lost his job." *Id*. at 137:10-12 (emphasis added). The impact of Su's *debarment* on a future job search has no bearing on whether Su has suffered pecuniary harm as a result of Dolci's *disclosures* of the reasons for the debarment.

Graham assumes that the June 24, 2008 debarment letter has been made a permanent part of Su's "background check profile" maintained by "the government." *Id*. at 84:21-87:2. When asked for the basis for this opinion, Graham stated that he had looked at some government websites[6] and that, "The government website said – the government websites that I looked at indicated that if there's – when they do this background check, it becomes part of the individual's profile." *Id*. at 85:25-86:3. He went on to opine, "that meant to me there was some permanency of that record then. . . . That means it had to be in the federal government's resources for that particular individual." *Id*. at 86:5-7. When asked whether he meant that Su's prior background check would be accessible in the future, Graham answered, "You know, that, I don't know. . . . I don't know what format they keep it in. I don't know what – you know, if it's a notation in the file or it's the actual background." *Id*. at 86:16-87:1. In summary then, after looking at some websites related to government employment, Graham opined that "the government" must store a copy of the debarment letter; the debarment letter would be disclosed if a government agency were to do a background check on Su in connection with some future application for employment; and such government agency would not hire Su once it saw the debarment letter. Even assuming for purposes of this motion that Graham is qualified to offer these opinions and has laid an adequate foundation for them, a future disclosure of the debarment letter would be outside the scope of Su's current claim for damages arising from Dolci's past disclosures to Su's employer and colleagues.[7]

---

[6] Graham identified the websites he looked at as Clearance.Jobs.com and fedattorney.com. Graham Dep. 87:8-88:21.

[7] Myers opined that another federal agency would not hire Su in light of his debarment from NASA Ames. *See* Myers Dep. 87:9-17, ECF No. 202-1. Myers reasoned that the revocation of access to

Accordingly, because Defendants have demonstrated that the record is devoid of evidence that Su suffered pecuniary harm as a result of the subject disclosures, and Su has failed to show the existence of a triable issue as to this material fact, Defendants are entitled to summary judgment with respect to the first claim for violation of the Privacy Act.

**B.     Second Claim for Violation of Informational Privacy Rights**

"While the Supreme Court has expressed uncertainty regarding the precise bounds of the constitutional 'zone of privacy,' its existence is firmly established." *In re Crawford*, 194 F.3d 954, 958 (9th Cir. 1999). There are at least two distinct kinds of privacy interests protected by the United States Constitution: the individual interest in avoiding disclosure of personal matters, and the interest in independence in making certain kinds of important decisions. *Id*. The former sometimes is referred to as the right of "informational privacy." *Id.* "The right to informational privacy, however, is not absolute; rather, it is a conditional right which may be infringed upon a showing of proper governmental interest." *Id*. at 959 (internal quotation marks and citation omitted). "[T]he government has the burden of showing that its use of the information would advance a legitimate state interest and that its actions are narrowly tailored to meet the legitimate interest." *Id.* (internal quotation marks and citation omitted).

In weighing the government's interest in using the information against the individual's interest in avoiding disclosure of the information, the Court should consider: "the type of record requested, the information it does or might contain, the potential for harm in any subsequent nonconsensual disclosure, the injury from disclosure to the relationship in which the record was generated, the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access." *Id*. (internal quotation marks and citation omitted). However, "[N]ot all . . . interests in nondisclosure of private information are of constitutional dimension, so as to require balancing government action against individual privacy."

---

NASA Ames would be a "negative factor" in a future background check. *Id*. at 87-3-5. As is discussed above, damages arising out of the debarment itself, as opposed to disclosure of the reasons for the debarment, are not recoverable, and damages arising from future disclosures are outside the scope of the current claim.

12

CASE NO. 5:09-cv-02838-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SJ

*Bailey v. City of Port Huron*, 507 F.3d 364, 368 (6th Cir. 2007) (internal quotation marks and citation omitted).

Su claims that Defendants violated his informational privacy rights by disclosing the determination that he is a security risk and the reasons behind that determination. Consol. Compl. at ¶¶ 99-100. He seeks injunctive relief restraining Defendants from making further disclosures, as well as a name-clearing hearing. Defendants contend that Su lacks standing to seek injunctive relief because he cannot show any real or immediate threat that Defendants will make any further disclosures in violation of Su's privacy rights, and that a name-clearing hearing is not an available remedy for an informational privacy claim. Alternatively, Defendants assert that Su's interest in the nondisclosure of the information at issue is not of constitutional dimension and that in any event NASA's interest in disclosing the information to the Earth Sciences staff outweighs Su's interest in keeping the information private.

Defendants' standing argument is dispositive. "To have standing to assert a claim for prospective injunctive relief, a plaintiff must demonstrate 'that he is realistically threatened by a repetition of [the violation].'" *Melendres v. Arpaio*, 695 F.3d 990, 997 (9th Cir. 2012) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983)). As is discussed above, Su asserts that immediately before and after his 2008 debarment from NASA Ames, Dolci disclosed protected information to Su's employer and colleagues. Defendants point to an absence of evidence in the record that Dolci or the other NASA officials named as defendants have disclosed the information to anyone since 2008. Defendants likewise point to an absence of evidence in the record suggesting that Defendants are likely to disclose the information to anyone in the future.

Su relies upon *Ibrahim v. Dep't of Homeland Sec.*, Case No. C 06-00545 WHA, 2009 WL 2246194 (N.D. Cal. July 27, 2009), in which Ibrahim, a non-resident alien Muslim woman, challenged the placement of her name on a United States government "no-fly" list that was circulated to airlines serving the United States. Ibrahim was detained and prevented from flying on one occasion as a result of the presence of her name on the no-fly list; that incident occurred approximately four years prior to the district court's consideration of her claim for declaratory or injunctive relief removing her name from the no-fly list. The defendants argued that Ibrahim lacked

13

standing because one stop, four years earlier, was insufficient to demonstrate that she was likely to be stopped again. In rejecting the defendants' argument and concluding that Ibrahim had standing, the court relied upon evidence that Ibrahim had concrete plans to visit the United States and her name continued to appear on the no-fly list. *Id*. at *5-6. Under those circumstances, the court concluded that Ibrahim had "a reasonable apprehension that she will be burdened again by being on the no-fly list." *Id*. at *5.

Su cites Hogle's deposition testimony, and in particular an exchange in which Hogle was asked "whether this debarment letter or the revocation of access could affect [Su's] ability to work in a federal facility in the future." Hogle Dep. 137:19-22, ECF No. 204-1. Hogle responded as follows: "I asked that question of Bob Dolci, and the answer was that Dr. Su's name would be on a list and every federal facility would have access to that list. That's all I know." *Id*. at 137:23-138:1. Su contends that because his name appears on the "list" referenced by Hogle, he has standing to seek injunctive relief under the rationale of *Ibrahim*. Su's circumstances are factually distinguishable from those giving rise to the decision in *Ibrahim*. First, it is unclear what sort of "list" Dolci was referring to in his conversation with Hogle. Presumably Dolci meant that if Su applied for a job with another federal facility, that facility would be informed of his debarment from NASA Ames. However, the fact that another federal facility would become aware of Su's debarment does not indicate that *Dolci* or other NASA officials are likely to make future disclosures as to the *reasons* for Su's debarment. Moreover, whereas in *Ibrahim* there was evidence that the plaintiff had concrete plans to fly to the United States, in the present case there is no evidence that Su has plans to apply for another job.

Finally, it is unclear what type of injunctive relief Su envisions. This Court could not order the fact of Su's debarment from NASA Ames to be removed from whatever "list" Dolci referenced, because the fact of his debarment is not subject to challenge in this action. At most this Court could order Dolci and the other named defendants to refrain from making future disclosures regarding the reasons for Su's debarment. It is not apparent what such an order would accomplish. As the record reflects, this information has been disclosed to Su's employer and colleagues and to the public in a newspaper article discussing this lawsuit. The bell cannot be unrung, and Su has failed to show that

14

it is likely to be rung again.

Turning to Su's request for a name-clearing hearing, that is the "remedy mandated by the Due Process Clause of the Fourteenth Amendment" for a claim based on stigmatization during discharge from employment. *Codd v. Velger*, 429 U.S. 624, 627 (1977). Su's due process claims have been dismissed from this case. Su has not cited, and the Court has not discovered, any case in which a name-clearing hearing was ordered as a remedy for a violation of the plaintiff's informational privacy rights. Nor would such a remedy make sense. The thrust of Su's informational privacy claim is that Defendants disclosed protected information regarding the reasons for Su's debarment. Su cannot, in the context of an informational privacy claim, "clear his name" by establishing that the disclosed information was false or misleading.

Accordingly, because Su lacks standing to seek injunctive relief, and a name-clearing hearing is not an appropriate remedy, Defendants are entitled to summary judgment with respect to the second claim for violation of Su's informational privacy rights.

## C. Third Claim Under the FTCA

The FTCA waives sovereign immunity for suits seeking money damages "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). However, the FTCA does not waive sovereign immunity for suits seeking injunctive relief, and there is no jurisdiction under the FTCA to award injunctive relief. *Westbay Steel Inc. v. United States*, 970 F.2d 648, 651 (9th Cir. 1992).

Su's FTCA claim is based upon an alleged violation of the California constitutional right of privacy. Consol. Compl. at ¶ 119. Defendants assert that money damages are not available for a California constitutional privacy claim, and thus that money damages are not available under Su's FTCA claim. Su contends that Defendants simply are wrong on the law, and that money damages are available under a FTCA claim based upon violation of California constitutional privacy rights.

The Court concludes that money damages are available under a FTCA claim based upon the California constitutional right of privacy. At least two district courts have held as much. *See Martel v. United States*, Case No. CIV S–11–3040 GEB CKD PS, 2012 WL 1555060 (E.D. Cal.

15

April 27, 2012); *Meier v. United States*, Case No. 07-15926, 2006 WL 3798160 (N.D. Cal. Dec. 22, 2006). In *Meier*, the plaintiff brought a FTCA claim based upon an allegation that an unauthorized disclosure of his medical records violated his California constitutional privacy rights. *Id*. at *6. The court rejected the United States' argument that the FTCA did not subject it to liability for violation of California constitutional privacy rights, and held expressly that the plaintiff's claim was "cognizable under the FTCA under Article I, Section I of the California Constitution." *Id*. The court noted that "California courts recognize the tort of invasion of privacy pursuant to the California Constitution." *Id*. (citing *Hill v. Nat'l Collegiate Athletic Assn.*, 7 Cal. 4th 1, 39-40 (1994)). The court observed further that the state constitutional privacy provision "'is intended to be self-executing, i.e., the constitutional provision, in itself, creates a legal and enforceable right of privacy for every Californian.'" *Id*. (quoting *Jeffrey H. v. Imai, Tadlock & Keeney*, 85 Cal. App. 4th 345, 353 (2001)). On appeal, the Ninth Circuit concluded that while the district court correctly concluded that the plaintiff's legally protected privacy interest in his medical records could support a tort claim under California law, the plaintiff had failed to establish the elements of such a claim as a factual matter. *Meier v. United States*, 310 Fed. Appx. 976, 979 (9th Cir. 2009).

Defendants rely upon *Katzberg v. Regents of Univ. of Cal.*, 29 Cal. 4th 300 (2002), which discusses numerous cases in which courts declined to award money damages for violations of the California constitution. However, *Katzberg* expressly declined to reach the issue of whether money damages are available for violation of California constitutional privacy rights, stating that, "We have no occasion to consider in the present case the circumstances under which the privacy clause of the state Constitution may support a cause of action for damages." *Id*. at 313 n.13.

The elements of a privacy claim under the California Constitution are: "(1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy." *Hill*, 7 Cal. 4th at 39-40. Even if the plaintiff satisfies these elements, the United States nonetheless may avoid liability if it establishes that the invasion of privacy was justified by legitimate competing concerns. *Id*. at 37-38. Alternatively, the United States may avoid liability by showing that the disclosures were permissible under the common interest privilege. *See* Cal. Civ. Code § 47(c).

Defendants argue that Su does not have a legally protected privacy interest in the FBI/NASA investigation and, in particular, the reasons for his debarment. Citing cases finding that the constitutional right of privacy covers medical records, financial details, and other information of a highly personal nature, Defendants assert that the information at issue here does not reach Constitutional dimension. *See* Defs.' Br. at 35 (collecting cases), ECF No. 193. The Court is at a loss to understand how Su would not have a legally protected privacy interest in an investigative determination by United States agencies that he is a security risk. *Cf. United States Dep't of Justice v. Reporters Comm. for Freedom of the Press,* 489 U.S. 749, 780 (1989). ("a third party's request for law enforcement records or information about a private citizen can reasonably be expected to invade that citizen's privacy"). Su's privacy interest appears particularly strong given his Chinese heritage and Dolci's implication that Su took money from a foreign government.

Defendants also argue that Su did not have a reasonable expectation of privacy with respect to the investigation records because he told his supervisors about the investigation and about taking a polygraph examination. Where a plaintiff himself disclosed the damaging information, "he will be hard pressed to claim any legally protected 'privacy' interest with respect to that information." *Pettus v. Cole*, 49 Cal. App. 4th 402, 448 (1996). While Su did tell a few UARC employees with whom he worked closely about the investigation and the polygraph test, *see* Coffland Dep. 13:1-7; Myers Dep. 51:19-52:3, there is no evidence that he shared this information with all of the UARC employees who were present at the July 3, 2008 staff meeting. Moreover, there is no evidence that Su shared with others Dolci's suggestion that he had taken money from a foreign government. Defendants argue that Dolci's comment was merely a hypothetical, and was not intended to refer to Su. The Court concludes that there is at least a triable issue of material fact as to whether Dolci was suggesting that Su took money from a foreign government. The comment was made at the end of a staff meeting about Su's debarment, and in response to Chinese-born employees asking how they could avoid Su's fate. Myers Dep. 69:9-14, ECF No. 202-1. Dolci responded by saying, "Don't accept money from another government and then deny it." *Id*. 69:16-19. A reasonable trier of fact certainly could infer that Dolci was saying that Su had taken money from a foreign government.

Defendants assert that even if the first two elements are met, there was no "serious" invasion

17

of Su's privacy. "[T]his element is intended simply to screen out intrusions on privacy that are de minimis or insignificant." *Amer. Academy of Pediatrics v. Lungren*, 16 Cal. 4th 307, 339 (1997). Defendants argue that the disclosures made at the July 3, 2008 staff meeting were insignificant because the information was merely being shared between NASA and its contractors, and because some of Su's supervisors and coworkers already knew some of the information. However, Dolci's statements could be construed to be accusations of treason. At least one of Su's coworkers responded to Dolci's statement regarding taking money from a foreign government with "total disbelief." Coffland Dep. 42:2-3, ECF No. 201-2. A reasonable trier of fact could conclude that the disclosures made in connection with Su's debarment from the NASA Ames facility constituted a serious invasion of Su's privacy.

Defendants next argue that any invasion of Su's privacy was justified by legitimate competing interests in maintaining a good relationship between NASA and its contractor, UARC, and in communicating a security decision to employees and contractors. The Court cannot conclude as a matter of law that Defendants had a legitimate interest in informing a group of up to thirty of Su's supervisors and colleagues that Su was considered a "security risk." Dolci himself expressed disbelief that he would have said that Su had lost access because he was a security risk, stating that, "That would have been incredibly foolish of me. I didn't need to say that." Dolci Dep. 208:5-8. The Court concludes that a reasonable trier of fact could find for either side on this issue.

Finally, Defendants contend that the disclosures in question fall within California's common interest privilege, which provides in relevant part that:

> A privileged publication or broadcast is one made . . . [i]n a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information.

Cal. Civ. Code § 47(c). In general, "a communication is presumed to be privileged where it is made in the context of the employment relationship." *Van Hull v. County of Monterey*, 1996 WL 225012, at *7 (N.D. Cal. 1996).

In its prior order denying Defendants' motion to dismiss Su's FTCA claim, the Court concluded that the common interest privilege applies in this case. Case No. 5:10-cv-00222, Order

18

CASE NO. 5:09-cv-02838-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SJ

of June 9, 2010 at 9, ECF No. 120. Now that the record has been developed beyond the pleadings, the Court concludes that it is not clear whether the privilege applies. Disclosures that an individual is a security risk, and may have taken money from a foreign government, are beyond the bounds of a normal employment-related communication. Moreover, it is not clear whether Defendants acted with "malice" in making the disclosures; if so, the common interest privilege does not apply. Cal. Civ. Code § 47(c). The Court previously opined that, "In light of NASA's express rule prohibiting the disclosure to a Contractor of the reason for a determination resulting in denial of access . . . Defendants' disclosure of the reason for Plaintiff's debarment to Plaintiff's supervisor would amount to willful or intentional conduct." Order of Dec. 16, 2009 at 19, ECF No. 63. Having reviewed the record as a whole, the Court concludes that triable issues of material fact exist as to whether the common interest privilege applies and whether Defendants acted with malice sufficient to defeat that privilege.

Finally, Defendants argue that Su's opposition brief indicates that Su is asserting a false light privacy claim, which Defendants contend would be barred by the defamation exception to the FTCA. Su's brief does assert that Defendants portrayed him in a false light, and that he is entitled to a name-clearing hearing. Pl.'s Opp'n at 37-38, ECF No. 194. However, those assertions appear in a separate section on remedy. The assertions do not purport to limit Su's FTCA claim to a false light claim.

Accordingly, Defendants are not entitled to summary judgment with respect to the third claim under the FTCA.

## IV. ORDER

Good cause therefor appearing, Defendants' motion for summary judgment is

(1) GRANTED with respect to the first claim for violation of the Privacy Act and the second claim for violation of informational privacy rights; and

(2) DENIED with respect to the third claim asserted under the FTCA.

Dated: April 17, 2013

EDWARD J. DAVILA
United States District Judge