JAMES MCMANIS (40958)
MICHAEL REEDY (161002)
TYLER ATKINSON (257997)
McMANIS FAULKNER
A Professional Corporation
50 West San Fernando Street, 10th Floor
San Jose, California 95113
Telephone:     408-279-8700
Facsimile:     408-279-3244
Email:         tatkinson@mcmanislaw.com

Attorneys for Plaintiff, Dr. Haiping Su

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| HAIPING SU,<br><br>        Plaintiff,<br><br>v.<br><br>NATIONAL AERONAUTICS AND<br>SPACE ADMINISTRATION, *et al.*,<br><br>        Defendants. | Case No. 5-09-cv-02838-EJD<br><br>**PLAINTIFF'S POST-TRIAL<br>PROPOSED FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW** |

Pursuant to the Court's Minute Order dated December 11, 2013, plaintiff submits the following Proposed Findings Of Fact And Conclusions Of Law:

**PROPOSED FINDINGS OF FACT**

<u>Su Was an Accomplished Chinese-American Scientist, Employed by the University of California, and Neither He Nor His Fellow Contractor-Employees Had Access to Sensitive Information</u>.

1.      Plaintiff, Dr. Haiping Su ("Su") was born in China and graduated from Zhejiang University with an agricultural degree.  (Uncontested Fact ("UF") No. 1; 27:19-21)

2.      Su immigrated to the United States in 1986 (UF No. 2; Su, 35:9-10), and is an American citizen.  (UF No. 4; 28:1)

3.      In 1991, Su earned a Master's Degree and a Ph.D. in Agronomy/Remote Sensing from Kansas State University.  (UF No. 3; 27:23-25)  In 2002, Su began working for Sky Research, a subcontractor of NASA contractor SAIC, at the Dryden Flight Research Center ("Dryden").  (UF No. 5; 28:2-4)

4.      In 2005, Su moved with his Sky Research colleagues to begin employment with a different NASA contractor, the Regents of the University of California.  (UF No. 6; 28:5-8)

5.      The contract program is referred to as the University Affiliated Research Center, or, "UARC."  (UF No. 6; 28:5-8)

6.      Since 2005, when the contract was initially awarded, Su has been an employee of the University of California, providing support to NASA's Earth Science Division. (UF No. 38; 32:13-15)

7.      Su was, and is, a highly valued scientist with the UARC.  (Hogle, 386:12-14; Myers, 470:15-22)  Su's co-workers believe Su has an excellent work ethic.  (Fegan, 355:2-3)

8.      Before he was debarred, Su's office was located in the Earth Sciences Division at NASA Ames Research Center ("NASA Ames").  (UF No. 9; 28:12-13)

9.      Steve Hipskind, a NASA civil servant, was the head of the Earth Sciences Division.  (Hipskind, 314:11-15)

10.     Working within the Earth Sciences Division, Su was a part of the UARC subgroup known as the "Earth Sciences Group."  (Hogle, 385:12-25)

11.     Su's immediate supervisor was, and is, University of California employee Jeff Myers.  (UF No. 8; 28:11; Myers, 461:11-25)

12.     In 2008, the organizational hierarchy for Su was: Su, Myers and Bruce Coffland (Myers's administrative assistant), Larry Hogle, and Bill Berry.  (Myers, 496:9-12)

13.     Su, Myers, Coffland, Hogle, and Berry were all University of California employees in 2008.  (Myers, 495:4-496:12)

14.     While Su was located at NASA Ames, Su only had access to public information. (Coffland, 530:6-9)

15.     Su's UARC team members are also designated as holding "nonsensitive positions."  (Myers, 490:8-13)

16.     Su's debarment did not change the nature of the data with which he works. (Myers, 489:21-23)

<u>Su Was Subjected to An Extensive FBI Investigation, During Which NASA Was Informed of Sensitive Investigation Details.</u>

17.     On March 3, 2006, the FBI sent a memorandum to NASA Headquarters, requesting a joint investigation of Su with the NASA Ames Counterintelligence Office.  (Exh. 62)

18.     The March 3, 2006, memorandum referred to activities allegedly involving Su that occurred when he was at Dryden, and then stated there was "a reasonable belief that Su presents a threat to national security."  (Exh. 62)

19.     NASA counterintelligence officer Reginald Waddell received a copy of the March, 2006, memorandum.  At that time, Su had moved to NASA Ames.  (UF Nos. 6, 9; Su, 45:11-46:4; Exh. 1012)

20.     Waddell gave a copy of the March, 2006, memorandum to Chief of Protective Services Robert Dolci.  (Dolci, 183:18-184:18)

21.     Dolci later discussed the March, 2006, memorandum with senior management on a "need to know" basis.  (Dolci, 226:19-227:8; 229:3-6)  At the time, no steps were taken to remove Su from the NASA Ames facility, to limit his access to the facility, or to advise his supervisors that Su was considered to be, or might be, a "security risk."  (Dolci, 227:11-15)

22.     Dolci could only share the fact that the FBI considered Su to be a "security risk" in 2006 "with people who had the appropriate security clearance and an absolute need to know." (Dolci, 231:21-232:15)

23.     At the time, NASA Security did not believe UARC staff had a need to know about the FBI's report to NASA: "It would have been inappropriate.  So unless you have a need to know, you just don't share any information that's inappropriate to share.  It's the Privacy Act."  (Dolci, 229:3-13)

24.     On or about July 5, 2007, Su submitted a badge application pursuant to Homeland Security Presidential Directive 12 ("HSPD-12").  (Su, 61:20-23)

25.     The badge application included a questionnaire called "e-QIP."  Dolci was responsible for ensuring compliance with HSPD-12.  (Dolci, 164:5-21)

26.     According to Dolci, Su's e-QIP application was "information that was intended to be used by the FBI to conduct their investigation."  It had "nothing to do with whether or not we were going to issue a badge."  (Dolci, 265:16-25)

27.     Dolci testified that the FBI was "using whatever means they could to get information to get Su to respond to their questions."  (Dolci, 267:21-22)

28.     During the subsequent FBI interviews, Su was asked questions directly out of his HSPD-12 application.  (Su, 83:6-14)

During the FBI Investigation, the Office of Personnel Management Reported a "Red Flag" to NASA.

29.     NASA submits e-QIP forms to the Office of Personnel Management ("OPM"), which determines "if there [is] something in an individual's background that we should be concerned about."  (Dolci, 207:12-21)

30.     On July 6, 2007, Su's HSPD-12 application was sent to the Office of Personnel Management ("OPM") for a National Agency Check Inquiry.  (Dolci, 205:20-24; Exh. 39)

31.     According to Dolci, "in this case, a red flag came up which said that there was an investigation being conducted."  (Dolci, 267:18-268:18)

32.     With the results communicated to NASA, OPM closed the badging investigation on March 14, 2008.  (Dolci, 269:21-24; Exh. 22)

33.     Dolci summarized: "OPM provided us their information and the flag came up."  (Dolci, 270:2-3)

Su Cooperated with the FBI's Investigation and Polygraph Examination.

34.     In February, 2008, Su was contacted by an FBI agent named Sherman Kwok who said he wanted to meet him regarding the HSPD-12 badge application.  (UF No. 24; Su, 71:20-72:6)

35.     Su met with Kwok and Waddell at NASA Ames on February 14, 2008.  (UF No. 24; 30:8-9)  At the February 14, 2008, meeting, Kwok discussed with Su his e-QIP questionnaire.  (Su, 71:20-72:2; 83:6-12)

36.     On March 12, 2008, Su had a follow-up interview with Kwok and Waddell.  (UF No. 24; 30:8-9)

1   37.   At the March 12, 2008, interview, Su agreed to take a polygraph examination.  On

2   March 21, 2008, Su took the polygraph examination.  (UF No. 25; 30:10-11)

3   38.   On April 11, 2008, Su had a final meeting with Kwok and Waddell.  (Su, 91:4-8)

4   On May 22, 2008, the FBI Sent a Memorandum to NASA, Reporting the Results of the

5   Su Investigation; the Results of the Investigation Were Communicated to Chief of

    Security Robert Dolci and NASA Division Chief Stephen Hipskind.

6   39.   On May 22, 2008, the FBI sent a memorandum about Su to NASA headquarters.

7   (UF No. 12; 28:18-19; Exh. 1015)

8   40.   The May, 2008, memorandum stated "[t]he results of this [polygraph]

9   examination are indicative of deception."  (UF No. 13; 28:20-21)

10  41.   The May, 2008, memorandum also discussed an alleged incident in October,

11  2005, when Su was working at Dryden.  (Exh. 1015)

12  42.   The May, 2008, memorandum further stated Su "was given several opportunities

13  to clarify, but he further denied any undisclosed contacts with foreign nationals seeking his

14  professional assistance."  (UF No. 14; 28:22-29:1)

15  43.   The May, 2008, memorandum also stated "there is a reasonable belief that Su

16  may present a threat to national security."  (UF No. 15; 29:2-4)

17  44.   The May, 2008, memorandum recommended "that NASA independently consider

    taking precautionary measures regarding Su's access to the U.S. Government facility and

18  information in order to address existing security concerns that Su has been unwilling to clarify."

19  (UF No. 16; 29:5-9)

20  45.   Dolci first saw the May, 2008, memorandum on May 28, 2008.  (Dolci, 218:17-

21  220:4)  However, Dolci waited over three weeks after getting the FBI memorandum before he

22  debarred Su.  (Dolci, 225:19-23)

23  46.   Dolci had authority to revoke Su's access without the approval of the Center

24  Director.  (Dolci, 225:1-18)

25  47.   Dolci "weighed the threat, the risk, the probability that additional harm could be

26  done over a couple week period as compared to all of the years that Su worked out there and

    decided it could wait until the Center Director got back."  (Dolci, 226:5-10)

27  48.   Dolci ultimately revoked Su's access based on a determination that "his continued

28  presence on NASA property constitutes a security risk."  (Dolci, 235:5-12; Exh. 1010)

49.     According to Dolci, his decision was based on information from the FBI and Waddell, including his review of various FBI memoranda, and specifically the May 22, 2008, memorandum from the FBI.  (Dolci, 191:3-17)

50.     Following Su's debarment, Stephen Hipskind, the Chief of the Earth Sciences Division at NASA Ames, advised Pete Worden, the NASA Ames Center Director, that "the entire ASTL staff [Airborne Science Technology Lab where the plaintiff worked] is extremely unsettled and upset over this incident." (UF No. 33; 31:12-18)

51.     Dolci thought that Hipskind's compassion for his employees was not going to help the situation, and that it would be counterproductive.  Dolci said Hipskind was "wearing his good guy hat and not his government hat" because scientists sometimes lack appreciation of the need for security.  (Dolci, 244:14-246:3)

52.     Hipskind received 24-hour security clearance so he could be briefed on Su's case. Hipskind was given clearance to help allay scientists' anxiety and fears.  (Hipskind, 336:20-25)

53.     In his 30 years at NASA Ames, Hipskind had never heard of anyone getting a similar clearance.  (Hipskind, 339:5-12)  Dolci also knew of no other case where interim clearance was granted to provide access to classified information about someone at NASA Ames; it was a "case of first impression" to Dolci.  (Dolci, 261:15-262:8)

54.     Once he was provided with security clearance, Hipskind was told that (1) the FBI conducted the investigation; (2) the FBI determined that Su was a "security risk;" (3) Dolci had received a memorandum from the FBI; and (4) Su's polygraph test showed deception.  (Dolci, 248:12-23)

55.     According to Hipskind, as part of his review of the file, he was shown an unredacted version of the FBI's May 22, 2008, memorandum.   (Hipskind, 344:9-16)  Hipskind was told at the interim security briefing that he could not tell the staff anything about the May 22, 2008, FBI memorandum, nor any of the details in the document.  (Hipskind, 346:16-25)

Before He Was Debarred, Su Discussed the Investigation Only On a Limited Basis, and Only With His Supervisors.

56.     The Government contends that Su, rather than NASA officials, made at least some of the disclosures at issue.  The Court, however, finds that before Su was debarred, he discussed the investigation only on a limited basis, and only with certain people.  He did not otherwise communicate his private information or otherwise waive his reasonable expectation of

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW; Case No. 5-09-cv-02838-EJD

privacy.

57.     At trial, no UARC staff member recalled hearing Su talk about the FBI investigation before the debarment.  Sophie Fegan testified Su never mentioned being interviewed.  (Fegan, 556:7-11)  Diane Gribshaw similarly testified Su did not discuss the investigation or polygraph at all before his debarment.  (Gribshaw, 700:7-15)  Rose Dominguez testified Su never mentioned anything to her about an interview or polygraph.  (Dominguez, 631:2-10)  Grant testified that he was "tremendously" surprised Su had been investigated—a revelation he first heard at the July 3, 2008, meeting held by NASA Security.  (Grant, 709:17-22; 720:3-11)

58.     On a limited basis, Su addressed with his UARC supervisors the fact that he was being questioned.  Larry Hogle first found out about the investigation by coincidence, and due to his role within UARC.  Hogle was the associate director of UARC during the investigation period.  In his managerial role, he provided supervision and coordination of UARC employees.  (Hogle, 381:8-382:16)  He was also involved in making sure every person on the UARC contract was able to get an HSPD-12 badge.  (Hogle, 382:17-19; 383:6-15)

59.     Su's badge was delayed compared to the other UARC employees, and Hogle was concerned about what was happening.  (Hogle, 388:19-20; 389:13-15)  Hogle testified that, once he realized the badge was delayed, "that's when I first found out that there had been an ongoing investigation that I had not been aware of before."  (Hogle, 388:21-22)

60.     According to Hogle, Su may have discussed the FBI interviews a total of three times.  (Hogle, 387:22-23)  During these discussions, Su said he had no idea what the investigation was about.  (Hogle, 388:24-389:1)

61.     Before he was debarred, Su advised Myers, his immediate supervisor, that he was being investigated by the FBI.  (Myers, 499:1-3)  Su's other supervisor, Coffland, also became aware Su was being interviewed by the FBI, but Coffland "can't say" and "can only assume" Su told him.  (Coffland, 544:3-11)

62.     Although Coffland spoke with Su about the existence of the FBI investigation, they did not have any substantive conversations.  (Coffland, 519:5-14; 544:22-24)

63.     NASA Security, rather than Su, was the source for information about the investigation.  Coffland recalls there was "generally a discussion that went throughout our

facility there and with other people and between NASA people." (Coffland, 544:7-11; 546:1-4). Hogle, who had known Dolci for many years (Hogle, 408:16-17), was able to get further information about the investigation, and discussed the eventual debarment with Myers "to keep me [*Myers*] informed of one of our star employees that we were probably losing." (Myers, 503:4-6)

64.     Myers learned from Hogle and Coffland that Su had undergone a polygraph exam. (Myers, 499:15-17)

65.     While Su and Coffland spoke about the polygraph examination, Su did not discuss it in detail.  (Coffland, 519:5-14; 544:22-24)

Su Was Escorted From the Facility; His Badge Was Returned, and He Was No Longer Deemed a Security Threat Following Debarment.

66.     Su was debarred and escorted out of NASA Ames on June 24, 2008. (UF No. 17; 29:10-11)

67.     Hogle requested that he be present when Su was notified of the debarment. (Hogle, 394:5-8)  Hogle and NASA Security alerted Jeff Myers that Su would be debarred. (Myers, 474:13-21)

68.     Myers testified he was in a state of "shock or disbelief" when he was told Su would be debarred.  (Myers, 477:13-14)

69.     Myers was told by NASA Security officer Ken Silverman that Su was losing his access privileges because NASA Security "determined he's a security risk," and Su had been "declared a security risk."  (Myers, 476:16-17; 500:6-11)

70.     Hogle, Myers, Silverman, and another security official went to Su's office. (Hogle, 394:17-21)  NASA Security told Su he was debarred, and gave him the debarment letter. (Hogle, 394:22-25)  Su looked shocked.  (Hogle, 395:4-6)  He was in a "state of disbelief" when he was told he was debarred.  (Myers, 477:24-25; Gribshaw, 696:8)

71.     Some of the UARC employees saw Su escorted from the facility, and their reaction to Su's debarment was alarm and discontent.  (Coffland, 528:5-10)  Myers did not speak with anyone coming out of their office about what was happening to Su at the time he was escorted from the premises.  (Coffland, 547:8-12)  Myers did not address anyone at the time of the occurrence about what happened after the debarment.  (Coffland, 529:3-15)\

<u>After Su's Debarment, His Supervisors Did Not Pass Along Investigation Details to Su's Co-workers</u>.

72.    The Government argues Su's supervisors were responsible for passing private information along to Su's coworkers.  The Court is not persuaded by the Government's contention.

73.    NASA Security, and not UARC officials, provided Su's personal information directly to UARC staff, principally at a July 3, 2008, meeting discussed below.  Indeed, UARC was not a party to the FBI investigation, and investigatory information about Su ultimately originated from NASA.

74.    Myers testified he did not take any action about employees' concerns regarding Su.  (Myers, 479:19-20)  Myers testified he may have told a "small number" of unidentified individuals that Su had been determined a security risk, i.e., information he learned from Silverman.  (Myers, 476:14-17; 478:23-25; 480:1-7; 500:6-11)  Myers did not formally meet with UARC staff about the debarment.  (Myers, 480:1-7)  Moreover, Gribshaw, Grant, and Fegan testified that Dolci's July 3, 2008, meeting was the first time they heard Su had been deemed a "security risk."  (Fegan, 561:4-7; 565:12-566:10; Gribshaw, 696:6-16; 697:14-16; 700:7-25; Grant, 709:19-22)

<u>After Debarment, Su Refrained from Discussing the Substance of the Investigation and Polygraph Examination, and Maintained That He Had No Idea What the Investigation Was About</u>.

75.    The Court finds Su refrained from discussing details of the investigation with his coworkers following his debarment.

76.    After Su was debarred, Myers had lunch with Su.  (Myers, 508:12-14)  Myers asked Su if he knew what was going on, and Su said he did not know.  (Myers, 508:15-17)  At some point after the debarment, at a group meet-up, Su told the group that he did not know what happened to get himself debarred.  (Gribshaw, 702:22-703:25)  "Su said that he didn't understand why he—what had happened.  He didn't know what was going on."  (Gribshaw, 700:5-6)  This statement was contrary to what Dolci had told people, i.e., that Su knew why he had been debarred.  (*See* Dominguez, 635:2-6; 638:17-25; Hogle, 392:3-5; 414:9-10)

<u>On July 3, 2008, Dolci and Hipskind Held a Meeting to Justify Su's Debarment to His Colleagues</u>.

77.     On July 3, 2008, Dolci convened a meeting with Su's UARC co-workers and NASA colleagues in the Earth Sciences Division.  (UF No. 18; 29:12-14)  Steve Hipskind and Dolci were present.  (Myers, 481:5-12)  The meeting was convened by the Earth Sciences Division to give some understanding of the debarment and the effect it had.  (Coffland, 520:11-15)  Hogle believes Hipskind requested that Dolci have the meeting, "civil servant to civil servant."  (Hogle, 417:5-7)  There is no evidence the meeting was motivated by any security concerns.  (*See* Dolci, 253:17-254:19 ("I did not believe that Su posed a threat once he was debarred."); Silverman, 691:4-8 (Silverman had no concern that Su might try to re-enter the NASA Ames premises after his badge was revoked))

78.     The meeting was held in the Earth Sciences Conference Room in Building 245 at Ames.  (Grant, 709:23-710:1; Myers, 480:19-20; Coffland, 519:21-23)  The attendees included people from "beyond UARC."  (Myers, 480:10-15)

79.     Estimates of the number of people present vary.  Hogle estimated about 25 to 30 people attended.  (Hogle, 399:6-7)  Fegan thought there were about 15 UARC people total.  (Fegan, 558:19-559:16)  Dominguez testified that approximately 15 people attended.  (Dominguez, 633:18-22)  Myers thought there were "probably 30 to 50 people there."  (Myers, 481:1-2)  Coffland thought a "couple dozen people" were present at the Dolci meeting.  (Coffland, 519:24-25)

80.     At the meeting, Dolci conveyed that there were sound reasons for the debarment.  (Coffland, 520:16-18)  Dolci was trying to assure the group that NASA had "grounds for what they did."  (Coffland, 521:5-6)  The tone in the meeting among the listeners was "disbelief," whereas Dolci and Hipskind showed "resolve."  (Grant, 722:22-723:12)  Dolci acknowledged the group's loyalty to Su.  (Grant, 721:25-722:3)

81.     The meeting lasted between half an hour to an hour.  (Grant, 740:18-19; Hipskind, 351:1-2)  The evidence shows that, at some point during the meeting, Dolci and Hipskind compromised Su's privacy in order to justify Su's debarment.

82.     Su's UARC co-worker, Patrick Grant, kept a day timer in 2008 (Grant, 710:21-22), and had been keeping one for almost 20 years.  (Grant, 710:23-711:4; 727:18-20)  Grant attended the July 3, 2008, Dolci meeting, and his notes from the meeting are marked as Exh. 139.  (Grant, 712:13-15; 712:19-24; 713:16-25)  The notes of Exh. 139 were written entirely during

the meeting.  (Grant, 713:4-7)  They were taken carefully, and all at once.  (Grant, 743:8-24; 744:10-19)  Grant paid close attention during the meeting, as it was "eye opening."  (Grant, 720:1-2)  Grant testified Dolci stated all of the items below the name of "Robert Dolci" on his day timer page.  (Grant, 714:19-23)

The July 3, 2008, Meeting Was Not for Security Purposes, And It Was Held to Justify Su's Treatment.

83.     The evidence demonstrates NASA did not view Su as a security threat once his badge was returned on the day of his debarment.  (Dolci, 253:24-254:19)  NASA, however, felt pressure to address the debarment with Su's co-workers, because they were shocked, surprised, and angry.  (Hogle, 398:15-16)  Scientists, according to Dolci, do not always have a good appreciation for the value of Protective Services. (Dolci, 246:1-3)  Su was "highly respected." "It's really hard to believe that there could be something going on that would be a detriment to the government.  You look at the individual.  And you give that individual the benefit of the doubt, and you just find it hard to believe."  (Dolci, 298:8-299:17)  Dolci was clear at trial that the July 3, 2008, meeting had to do with the concerns raised about Su by his co-workers.  "That's why they were there and that was what was in [Hipskind's] email."  (Dolci, 256:21-257:16)

84.     Although Su's co-workers were concerned about Su's debarment, the Court credits the testimony of Su's supervisor, Jeff Myers, who testified that the debarment was not impacting the ability of the UARC employees to complete their job responsibilities.  (Myers, 502:21-23)  Thus, the Court concludes the reason for the meeting was contractor-employees' general concerns, rather than security issues or serious productivity concerns.

When the Dolci Meeting Took Place, Many of Su's Co-workers Had Not Heard About the "Security Risk" Determination.

85.     The Government contends that by the time of the Dolci meeting, Su's private information had already been disseminated.  The Court does not adopt this view.  Many of Su's co-workers were not aware of the "security risk" determination until Dolci told them at the July 3, 2008, meeting.

86.     Diane Gribshaw, who did not socialize with Su, was surprised to hear Su referred to as "a security risk."  (Gribshaw, 697:14-16)  Also, Su did not discuss the investigation or polygraph or "security risk" designation with Gribshaw.  (Gribshaw, 700:7-15)  The meeting

with Dolci was the first occasion Gribshaw came to learn Su had been investigated by either NASA or the FBI.  (Gribshaw, 700:22-25)

87.     Patrick Grant, who worked in a different building from Su and did not socialize with him (Grant, 707:25-708:4; 708:20-24), learned of Su's debarment for the first time at the Dolci meeting.  (Grant, 709:17-22)  Grant was "tremendously" surprised by the information he heard in the Dolci meeting.  (Grant, 720:3-11; 720:19-21)

88.     Sophie Fegan's past recollection recorded on February, 2011, was admitted into evidence as follows: "Question: Why do you think Su's access to NASA Ames was revoked? Answer: Well, he was a security risk.  Question: And what is the basis for that opinion?  Answer: That's what, that's what the guy at – the NASA security guy told us."[1]  (Fegan, 565:12-566:10)

Defendant Violated Su's Privacy in No Less Than Eight (8) Instances.

89.     The Court finds that that, in no less than eight (8) instances, the Government improperly discussed with Su's coworkers and employer private details regarding the federal investigation.

A.  *Breach Number 1: Before Su Was Debarred, NASA Security Informed Su's University of California Supervisor That He Was Allegedly Not Truthful During the Investigation.*

90.     The Court finds that, before Su was debarred, NASA Security informed Su's employer and supervisor that he was not being truthful during the FBI's investigation.

91.     The FBI reported to NASA, in classified memoranda, that Su was allegedly not truthful during the investigation.  (UF No. 16 (according to the May 22, 2008, memorandum, Su was allegedly "unwilling to clarify" security concerns); UF No. 13 (memorandum stated the polygraph results "are indicative of deception"))

92.     This information was then communicated from NASA to UARC supervisor Larry Hogle.  Hogle spoke with Dolci "at least two or three times prior to the debarment."  (Hogle, 390:22-24)  Dolci told Hogle "there was a question being asked of Su, that all he needed to do was answer it.  And it had been asked in three different ways, and he was not answering the question."  (Hogle, 391:8-11)  Dolci told Hogle they wanted Su to answer the question truthfully.  (Hogle, 392:6-8)

93.     Dolci also told Hogle that Su knew what this was about.  (Hogle, 392:3-5)

_____

[1] During cross-examination at trial, Fegan was confused as to where she heard security risk, from whom, and when.

94.     According to Hogle, Dolci said, "Su knew about it and all they wanted him [Su] to do was to answer truthfully a particular question."  (Hogle, 414:9-11)

### B. *Breach Number 2: The Government Informed Su's Employer and Supervisor, Larry Hogle, That Su Was an Alleged "Security Risk."*

95.     The Court finds the Government informed Su's employer and supervisor Su was a "security risk."

96.     On the morning of the debarment, Ken Silverman gave Larry Hogle a copy of the debarment letter addressed to Su.  (Hogle, 393:4-7; Exh. 1010)  The letter included a statement that Su had been deemed a "security risk."  (Exh. 1010)  The letter is not marked "private" or "confidential," and Hogle does not recall being told to keep the letter confidential.  (Hogle, 393:19-23)

97.     Dolci testified he complied with section 4.9.6.2 of NASA Security Program Procedural Requirements ("NPR") 1600.1, which states "adverse information shall not be disclosed to the individual's employer since it could affect the individual's employment and possibly subject NASA to legal liability."  Dolci asserted he did not provide information that Hogle did not already know.  (Dolci, 278:15-23)  However, Hogle testified that, before Silverman gave him the debarment letter, Hogle had no reason to believe Su allegedly represented a "security risk."  (Hogle, 393:15-18)  Indeed, until he was told otherwise, Hogle thought the investigation had concluded months earlier.  (Hogle, 392:11-13)

98.     After the debarment, both Dolci and Silverman told Hogle the debarment was because of the FBI investigation.  (Hogle, 397:18-20; 398:7-9)

### C. *Breach Number 3: Post-Debarment Comments to Coffland Regarding Su's Polygraph Performance.*

99.     The Court finds that, following Su's debarments, Dolci told UARC's Coffland that Su had failed his polygraph test.

100.     After Su was debarred, his UARC colleagues were puzzled, confused, and angry. (Myers, 502:2-9)  They found Su's debarment unexpected, abrupt, and arbitrary.  (Myers, 502:10-15)  Su's co-workers had great concern for Su personally and professionally and wanted to see him overcome the situation.  (Coffland, 525:15-17)  The Government concedes it attempted to deal with these concerns by having Su's co-workers briefed by NASA security and Steve Hipskind, who had reviewed the FBI investigation file.

101.   After the debarment, Dolci discussed the polygraph results with Coffland. (Coffland, 525:25-526:1)  Dolci told Coffland Su had a particular problem with the examination. (Coffland, 526:9-12)  Su ultimately heard about this accusation from Myers, post-debarment, when Myers told Su about his performance on the polygraph test.  (Su, 106:5-107:22)

D.   *Breach Number 4: The Government's Statements That the FBI Deemed Su a Security Risk, His Debarment Was Due to a Security Breach, He Was a Risk to National Security, Su Knew Why He Was Debarred, and Details About the FBI Investigation, Including That the Findings Against Su Were Allegedly "Very, Very Bad."*

102.   The Court further finds that NASA told Su's co-workers details about the federal investigation, including allegations that Su is a security risk, and that the findings against Su were "very, very bad."

103.   At the July 3, 2008, meeting, Dolci reported to Su's co-workers that there were security concerns about Su.  (Hogle, 402:23-25; Grant, 716:16-24; Myers, 481:14-15)  Dolci referenced national security, and the fact that the FBI conducted an investigation of Su.  (Hogle, 402:17-22)  Dolci mentioned that the debarment was based on the investigation of Su, and the determination Su was a security risk.  (Coffland, 521:7-14)

104.   A "Memorandum from FBI" was mentioned at the meeting, as recorded in Grant's notes.  (Exh. 137)  Grant drew a line from Memorandum from FBI to "Security Risk" because the statements were made in connection with each other.  (Grant, 717:3-5)  At trial, Dolci testified the decision to debar Su was based on the May 22, 2008, memorandum from the FBI. (Dolci, 266:1-9; Exh. 1010)

105.   The evidence shows that Dolci told the assembly there had been an extensive investigation of Su.  (Gribshaw, 697:20-23)  Witnesses report Dolci made references to the FBI as involved in the investigation.  (*See, e.g.,* Gribshaw, 698:7-14)[2]  Based on what Dolci said, Gribshaw came away with an opinion that the investigation of Su was "extensive and deep and highly classified."  (Gribshaw, 698:24-699:2)

106.   According to Gribshaw, Dolci said the "Center Director" had "reviewed the information and made the decision."  (Gribshaw, 698:2-9)  This detail is also found in the debarment letter (Exh. 1010) and referenced in Grant's notes (Exh. 139).  Dolci also offered the following information in further "explanation to people [as to] why Haiping Su was being

---

[2] Hogle asked Dolci why Su had been debarred, and Dolci said it was the result of an FBI investigation.  (Hogle, 407:3-6)

removed:" "Memorandum from FBI," "Lou Braxton," and "Center Director." (Grant, 717:3-22; see Exh. 12, identifying Lew Braxton in 2007 as "Director, Center Operations")

107.    Mr. Dolci said that there were "recommendations made by the FBI" regarding Su. (Dominguez, 647:5-7)  This statement discloses classified information from the May 22, 2008, memorandum, which "recommended" that NASA take action to limit Su's access to NASA Ames. (Exh. 1015)

108.    Dolci also stated at this meeting that Su allegedly knew the reason for his debarment. (Dominguez, 635:2-6)  Multiple witnesses report hearing Dolci say this (Hogle, 392:3-5; 414:9-11), despite Dolci's testimony that Su was obviously upset and kept wondering "what was going on and why" when Su called Dolci after the debarment. (Dolci, 242:8-243:12)

109.    Hipskind said at the conclusion of the meeting that he "had been given access to material" to which UARC personnel had not been given access and that Hipskind understood why the action was taken. (Hogle, 399:10-15)

110.    Hipskind said he received interim security clearance, and reviewed material and felt the debarment was justified. (Coffland, 522:10-15)  Hogle understood the information provided to Hipskind "apparently required a secret or top secret clearance to be able to review them." (Hogle, 421:22-24)  Hipskind said he was convinced Su was a security risk. (Coffland, 527:20-24)

111.    Grant recalls Hipskind spoke at the Dolci meeting and said that he read Su's file and it is "very, very bad." (Grant, 720:19-721:9)  The reaction to Hipskind's statement was "dead silence." (Hogle, 399:16-17)

E.    _Breach Number 5: The Government's Statements That Su Breached Security_
      _or "Something Happened" at Su's Previous Employment._

112.    The Court also finds that NASA suggested to Su's coworkers that Su breached security at his previous employment.

113.    Whether Su posed a threat to security based on conduct that occurred before Su began working at NASA Ames is classified information. (Waddell, 606:19-25)  However, Dolci believes he told some people that Su was debarred based on conduct that occurred before Su came to NASA Ames, and this information came either from Waddell or an FBI memorandum. (Dolci, 217:11-218:10)

114.  Dolci told Su's co-workers that the debarment decision "had nothing to do with work at Ames." (Myers, 481:14-16)  Dolci said that the debarment had to do with Su's "prior career." (Myers, 481:21-22)  Dolci said that Su was being dismissed due to fallout from his previous employment (i.e., Dryden), which had to do with a classified position or breach of security. (Grant, 722:18-21; 739:1-19)  Dolci admitted at trial he told people that to avoid Su's fate, you need to be aware of issues that come up in your I.T. security training "that might be construed as a breach in security." (Dolci, 251:14-252:13; 256:21-257:5)

F.  *Breach Number 6: The Government's Accusations That Su Was Associated with Questionable Foreign Contacts or Took Money from a Foreign Government and Then Denied It.*

115.  The Court further finds NASA improperly suggested to Su's coworkers that he took money from a foreign government and then denied it.

116.  From the May 22, 2008, memorandum (Exh. 1015), Dolci understood one of the reasons the FBI recommended Su be treated as a security risk was their belief that he had not fully disclosed his contacts with foreign nationals.  (Dolci, 286:11-287:1; 289:10-22)

117.  At the very end of the July, 3, 2008, meeting, either Hipskind or Dolci said, "Don't accept money from a foreign government and then deny it" in response to the question "how do I know that I'm not going to be debarred myself?"  (Myers, 482:5-14)  This was "the first piece of information that we had had based on, you know, regarding any rationale behind debarment."  (Myers, 509:14-16)  Myers was dismayed to hear it.  (Myers, 509:17-18)  Coffland recalls Hipskind making the statement, but thinks it was made at a separate meeting, less than one month after the July 3, 2008, meeting.  (Coffland, 524:2-6)  At that meeting, Hipskind said: "Don't take money from a foreign government and then deny it."  (Coffland, 524:14-19)  Dolci recalls hearing Hipskind say something that surprised him, but Dolci does not recall what that statement was.  (Dolci, 300:25-301:14)

118.  Hipskind remembers Dolci saying something to the effect that people should not take money from another government and then deny it.  (Hipskind, 352:6-11)  Hipskind considered it to be a hypothetical example—although Dolci did not give any other examples. (Hipskind, 352:1-19)  Myers also did not recall any other "hypothetical questions" offered at the July 3, 2008, meeting.  (Myers, 511:14-16)  According to Coffland, the statement regarding money from a foreign government was a summary of what transpired with Su.  (Coffland,

15

524:21-22)  The statement was memorable to Coffland, who had concern for Su personally and professionally, and thought the foreign government reference "probably wasn't appropriate." (Coffland, 525:6-9)

119.    Sophie Fegan later asked Su's wife, Sharyn Su, if they took government money. (Sharyn Su, 761:9-11)  According to Myers, after the July 3, 2008, meeting, it was understood as a fact that Su was debarred because he had received money from a foreign government and then hid it. (Myers, 507:16-22)  Fegan told Sharyn Su that they had a meeting and the NASA officials were telling them these things.  (Su, 117:25-119:1; Sharyn Su, 761:9-19)

G.  _Breach Number 7: The Government's Statement Regarding a "FISA Regulation"_

120.    The Court finds the Government, in justifying the debarment to Su's coworkers, discussed a "FISA regulation" and Su's purported contact with "foreign nationals."

121.    The evidence shows that Dolci also referenced a "FISA regulation" as part of his presentation. (Grant, 719:12-20)  Grant's notes in this regard are corroborated by Dominguez, who testified either Dolci or Hipskind commented that Su's debarment was related to foreign nationals or foreign internationals.  (Dominguez, 644:4-9; 660:4-10)  "FISA" apparently referred to the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801, _et al_.

122.    The Court believes that defendant's references to FISA and foreign contacts, in discussions of the basis for Su's debarment, further invaded Su's privacy.

H.  _Breach Number 8: The Government's Statements Regarding Su's Badge and Background Check._

123.    The Court finds the Government discussed with Su's coworkers the results of his badge application and background check.

124.    At the July 3, 2008, meeting Dolci said the meeting was held as a result of things that occurred relating to Su's HSPD-12 badging process.  (Dominguez, 647:1-4; Grant, 718:1-17)  Dolci admitted he may have discussed the HSPD-12 program at the July 3, 2008, meeting, but it was not his intent to do so.  He does not believe he discussed the OPM.  (Dolci, 216:6-15)

125.    Su's e-QIP application form had been sent to the Office of Personnel Management (OPM) for a National Agency Check Inquiry in July 2007.  (Dolci, 205:20-24; Exh. 39)  OPM is responsible for all personnel and civil service that work for the government.  NASA submits e-QIP forms to the OPM, which determines "if there [is] something in an individual's

background that we should be concerned about."  (Dolci, 207:12-21)  Grant's notes literally read: "HSPD-12 Office of Personnel Management – OPM file database."  (Exh. 139)  Corroborating Grant's notes, Dolci testified, "[I]n this case, a red flag came up which said that there was an investigation being conducted."  (Dolci, 267:18-268:18)

## PROPOSED CONCLUSIONS OF LAW

<u>Jurisdiction</u>

126.    Plaintiff's lawsuit is for breaches of the California constitutional right to privacy. Cal. Const., art. 1, § 1.

127.    The Federal Tort Claims Act ("FTCA"), Title 28, Section 1346 of the United States Code, provides this Court jurisdiction to hear:

> claims against the United States, for money damages . . . caused by the negligent or wrongful act or omission . . . under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

128.    The elements of plaintiff's California constitutional privacy claim are: "(1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy." *Hill v. Nat'l Collegiate Athletic Assn.*, 7 Cal. 4th 1, 39-40 (1994).

129.    The Court finds, under the particular facts of this case, the gravamen of plaintiff's privacy claim does not implicate an exception to the FTCA.  See 28 USC § 2680 (h); *Meier v. United States*, 2006 U.S. Dist. LEXIS 93138, 19-21 (N.D. Cal. Dec. 22, 2006); s*ee Doe v. United States*, 83 F. Supp. 2d 833, 838-39 (S.D. Tex. 2000) (plaintiff may allege conduct in which some aspect is barred because it arises out of an excepted tort, and other aspects that are not barred because it does not arise out of an excepted tort); Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment, p. 15:14-19:20.

130.    The Court therefore finds it has jurisdiction to hear plaintiff's state privacy claim pursuant to the FTCA.

<u>The United States Violated Su's State Constitutional Right to Privacy.</u>

131.    Plaintiff's lawsuit is based on the California constitutional right to privacy.  Cal. Const., art. 1, § 1.  The elements of the constitutional privacy claim are: "(1) a legally protected

privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by

defendant constituting a serious invasion of privacy." *Hill v. Nat'l Collegiate Athletic Assn*., 7

Cal.4th 1, 39-40 (1994).

    A.   <u>Su Had Legally Protected Privacy Interests In the Matters Disclosed By the Government</u>.

132.     The first essential element of a state constitutional cause of action for invasion of

privacy is the identification of a specific, legally protected privacy interest.  This is a question of

law that depends on social norms, common law developments, constitutional development,

statutory enactment, and the ballot arguments for the Privacy Initiative.  *See Hill, supra,* 7

Cal.4th at 35–36.

133.     As a general matter, the state privacy protections are broader than those of federal

law.  *American Acad. Of Pediatrics v. Lungren*, 16 Cal.4th 307, 327-28 (1997).  Under the state

law, Boy Scout "volunteer ineligibility files" have been found to be "manifestly" protected.

*Juarez v. Boy Scouts of America, Inc*., 81 Cal.App.4th 377, 390-91 (2000) (finding "manifestly

within the [California] Constitution's protected area of privacy" certain "records maintained by

the Scouts (1) to identify individuals who have been determined to be 'unfit' in case they try to

register as scouting volunteers in the future; and (2) to document information as to why an

individual was declared ineligible in the event he should challenge that determination.")

134.     Furthermore, California courts have also found polygraph tests implicate personal

privacy.  *See, e.g.*, *Long Beach City Employees Ass'n v. City of Long Beach*, 41 Cal.3d 937, 956

(1986) (California public employees cannot be compelled to undergo a polygraph examination as

condition of employment); *see also White v. Davis* 13 Cal.3d 757 (1975) (opinion cited by *Long

Beach City Employees Ass'n* and noting that the state constitutional privacy right embraces the

importance of mental privacy, such as privacy of thoughts and emotions).  Analogously, a

plaintiff's mental health records have also been found protected by the California constitution.

*Susan S. v. Israels*, 55 Cal.App.4th 1290, 1299 (1997) (plaintiff stated sufficient state

constitutional privacy claim where defendant read and disseminated mental health records

knowing the information contained highly sensitive and embarrassing information which caused

emotional distress to plaintiff).

135.     In the present case, as a general matter, Su had a legally protected privacy interest

in an investigative determination by United States agencies that he is a "security risk."  *Cf.

1    *United States Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 780

2    (1989) ("a third party's request for law enforcement records or information about a private

3    citizen can reasonably be expected to invade that citizen's privacy"); *Juarez, supra*, 81

4    Cal.App.4th at 390-91 (right of privacy in Boy Scouts' investigative files).  Su also had a legally

5    protected privacy interest in the investigative determination by United States agencies that he

6    allegedly failed a polygraph test, and details about his performance on the polygraph test.  *Ibid.*;

7    *Susan S., supra,* 55 Cal.App.4th at 1299; *see Long Beach City Employees Ass'n*, 41 Cal.3d at 956

     (privacy interest as to polygraph); *see also White, supra*, 13 Cal.3d 757 (1975) (privacy interest

8    in thoughts and emotions).

9         136.    Su had a legally protected privacy interest in the investigative determination by

10   federal agencies that Su allegedly: (1) threatened security based on something he did at his

11   previous place of employment, (2) accepted money from a foreign government and then lied

12   about it, and (3) that his debarment was in connection with HSPD-12 or the Foreign Intelligence

13   Surveillance Act.  *See United States Dep't of Justice, supra*, 489 U.S. at 780; *Juarez, supra*, 81

14   Cal.App.4th at 390-91.

15        137.    Su also had a legally protected privacy interest in an investigative determination

16   by federal agencies that his debarment was triggered or related to issues related to his badge

17   application.  *See United States Dep't of Justice, supra*, 489 U.S. at 780; *Juarez, supra*, 81

18   Cal.App.4th at 390-91; *Pettus v. Cole*, 49 Cal.App.4th 402, 441 (1996) (employee had California

     constitutional privacy interest in his "social history of his life from the time of his birth, with his

19   family of origin, through a marriage and divorce, to the present . . . .").

20        138.    Su's privacy interests were particularly strong given his Chinese heritage, and the

21   Government's statement that Su took money from a foreign government and denied doing so.

22        139.    Furthermore, in the present case, the United States has effectively conceded that

23   each of the disclosures concerned private information.  Dolci admitted he testified in his

24   deposition that he "cannot believe" he would tell people that Su was security risk.  "That would

25   have been incredibly foolish of me.  I didn't need to say that."  (Dolci, 252:16-23 (emphasis

26   added))  Moreover, Hipskind was told at the interim security briefing that he could not tell the

27   staff anything about the May 22, 2008, FBI memorandum.  (Hipskind, 346:16-25)  According to

28   Silverman, an employer is not entitled to details concerning the removal of a contractor.

(Silverman, 679:14-25)  Other than the June 24, 2008, meeting where he served the debarment letter on Su, Silverman testified he never told anyone Su was considered to be a security risk. Silverman would never tell anyone because it is "nobody's business." (Silverman, 676:18-677:9)  Similarly, Waddell testified: "Outside individuals did not have a 'need to know' the results, and as a CI [counter-intelligence] agent, I would certainly not divulge that information to anyone who did not have a need to know." (Waddell, 616:14-22)

140.    With regard to the June 24, 2008, debarment letter, Dolci considered Su to be a security risk based on information in the FBI memoranda, which were classified.  Dolci could not divulge the contents of the memoranda unless the person being informed had the appropriate security clearance and a need to know.  "The members of the UARC staff did not have the appropriate security clearance the need to know information in the FBI memoranda." (Dolci, 234:23-235:24)  Before the July 3, 2008, meeting, when Hogle asked why Su was being debarred, Dolci answered that he "couldn't speak to that."  According to Dolci, it would have been inappropriate to tell Hogle why he thought Su was a security risk.  (Dolci, 237:3-238:3)

141.    The disclosed information also represents a form of Personally Identifiable Information ("PII").  Dolci admitted it was the responsibility of Protective Services to safeguard PII.  (Dolci, 156:18-157:1)  Dolci further agreed that NASA Security had a special responsibility to protect personal information from loss and misuse.  (Dolci, 158:3-13)  PII is defined by NASA as "any information maintained by NASA that can be used to uniquely identify an individual." (Dolci, 160:6-20 and Exh. 32)  Protected PII includes the combination of a person's name with (1) medical, financial, or criminal records about that person, or (2) employment information, including ratings and disciplinary action.  (Dolci, 160:16-161:7; Exh. 32)

142.    Furthermore, information included in an e-QIP application is protected by the Privacy Act.  (Dolci, 175:23-176:1)  Dolci met with Hogle before Su was debarred to discuss the FBI investigation.  At the time, when Hogle asked why Su was being investigated, Dolci said he could not speak to the case or the details of the case.  Dolci testified there were three reasons he could not do so: (1) it was a classified case; (2) speaking of it could have jeopardized Dolci's security clearance; and (3) he's always concerned for the individual.  (Dolci, 220:18-221:6)

143.    Moreover, Dolci testified he did not tell the UARC staff that Su was considered to be a security risk in 2006 because they had no "need to know."  "It would have been

1    inappropriate.  So unless you have a need to know, you just don't share any information that's

2    inappropriate to share.  It's the Privacy Act." (Dolci, 229:3-13)  Even if Dolci considered Su to

3    be "an imminent threat to national security," or if he thought that Su was putting the interests of

4    the United States or NASA at risk, he would not have notified UARC staff because they did not

5    have a "need to know." (Dolci, 230:13-20)  Indeed, Hipskind needed a security clearance so he

6    could be told that (1) the FBI had conducted an investigation; (2) the FBI determined that Su was

7    a security risk; (3) Dolci received a memo from the FBI; and (4) the polygraph test showed

     deception. (Dolci, 248:12-23; Hipskind 347:1-7)

8        144.    In addition, the contents of the 2006 FBI memorandum (Exh. 62) are "not to be

9    distributed outside of your agency."  The second page of the document requests that NASA only

10   advise individuals with the appropriate security clearance and an absolute need to know.  Dolci

11   admits he could only share the fact that the FBI considered Su to be a security risk "with people

12   who had the appropriate security clearance and an absolute need to know." (Dolci, 231:21-

13   232:15, Exh. 62)

14       145.    Thus, as a matter of law and under the particular facts of this case, Su had a well-

15   established right to privacy in the information at issue.

16       B.   *Su Had a Reasonable Expectation of Privacy Under the Circumstances.*

17       146.    The reasonableness of an expectation of privacy is a mixed question of law and

18   fact.  Factors affecting the extent of a privacy interest include advanced notice of impending

     action, customs, societal norms and practices, physical settings surrounding particular activities,

19   and the presence or absence of opportunities for voluntary consent.  *Hill, supra,* 7 Cal.4th at 36–

20   37.  This element contemplates an inquiry into whether there is something in the particular

21   circumstances in which an alleged intrusion of privacy arises that demonstrates plaintiff has no

22   reasonable expectation of privacy in that context, so that the intrusion would not violate the state

23   constitution.  *American Acad. of Pediatrics, supra,* 16 Cal.4th at 338.

24       147.    Under the applicable state law, "[a] 'reasonable' expectation of privacy is an

25   objective entitlement founded on broadly based and widely accepted community norms." *Hill,*

26   *supra*, 7 Cal.4th at 37; *Susan S., supra*, 55 Cal.App.4th at 1295.  Here, Su had a reasonable

27   expectation of privacy in these matters because he was not aware of the government's

28   conclusions about him (Su, 109:12-22); he was not aware the government would communicate

21

with his coworkers about the investigation (Su, 109:20-110:1); he did not divulge information to coworkers (Myers, 472:4-12;  Hogle, 388:6-12; Coffland, 525:18-20; 546:5-7); he was not a federal employee and had no access to confidential or secret information (Myers, 490:8-10, Fegan, 552:24-553:1; Dominguez, 626:15-16; 634:8-9; 634:24); he participated in the FBI's investigation in good faith (Su, 83:11-20; 84:5-8); he had no reason to believe the Government would take this course of action (Su, 84:15-24); and the recipients of the information about him, themselves, had no particular security clearance to hear the information.  (Dolci, 235:21-24; Hogle, 383:16-20; 400:10-17)

148.    Su's fellow contractors' shock and disbelief at what they heard at the July 3, 2008, meeting further confirmed that Su did not previously inform them of the allegations against him, and that reasonable people found the information shocking.

149.    Su further had a reasonable expectation of privacy insofar as he was not informed why the government designated him a security risk, nor given an opportunity to address the accusations.  (Su, 104:9-25; 105:20-106:1; 114:24-115:1; 135:4-7; Dolci, 255:5-10)  Indeed, no charges have ever been filed against Su, and he has no criminal record.  Su also had a reasonable expectation that the government, in conducting a confidential background investigation of him, would not divulge to third parties purported determinations made during the investigation.

150.    Moreover, the Government's testimony at trial reinforced Su's reasonable belief in the private nature of the information.  Hipskind was told at the interim security briefing that he could not tell the staff anything about the May 22, 2008, FBI memorandum.  (Hipskind, 346:16-25)  Dolci would not have instructed Silverman to give copies of the June 24, 2008, debarment letter to Hogle or Myers because it was not appropriate.  (Dolci, 236:19-237:2)  Dolci knew he "had to protect [Su's] privacy."  At various times Dolci told people he could not share information about Su because it was "classified" or "confidential" or "sensitive."  (Dolci, 256:5-13)  When Hogle originally asked why Su was being debarred, Dolci said he could not respond. (Dolci, 297:16-22)  Hipskind first spoke with Dolci on June 24, 2008, to find out "the nature of the debarment action."  At that time, Dolci said he could not disclose the reason.  (Hipskind, 327:12-328:9)

151.    Furthermore, Waddell keeps the original signed version of the debarment letter in a security container.  Waddell testified: "It's a 3-position dial GSA approved five-drawer

security container that houses classified, and in this case, sensitive but unclassified, information." Waddell keeps the letter in the secured container to protect Su's privacy.  (Waddell, 615:14-616:13)

152.    Ultimately, a plaintiff does not have to prove that he or she had a "complete expectation of privacy;" rather, "[p]rivacy for purposes of the intrusion tort must be evaluated with respect to the identity of the alleged intruder and the nature of the intrusion." *Sanders v. American Broadcasting Companies*, 20 Cal.4th 907, 917-918 (Cal. 1999).  Here, the Court finds that the facts and circumstances strongly support a finding of Su's reasonable expectation of privacy.

C.    *The Government's Conduct Represented Serious Invasions of Su's Protected Privacy Interests.*

153.    The issue of whether a serious invasion has occurred is a mixed question of law and fact. An actionable invasion of privacy under the state constitution must be sufficiently serious in its nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right.  *See Hill, supra*, 7 Cal.4th at 37.  For example, the disclosure to an employer of information contained in psychiatrists' reports concerning an employee's past and present drinking habits, and strongly held views about racism among his coworkers and company management, was found to be a serious intrusion into an employee's right of informational privacy.  *Pettus, supra*, 49 Cal.App.4th at 445.

154.    *Loder v. City of Glendale,* 14 Cal.4th 846, 895, n.22 (1997), explains that the "serious invasion" element is intended to screen out intrusions on privacy that are de minimis or insignificant.  Thus, for example, in *American Acad. of Pediatrics, supra*, 16 Cal.4th at 338–339, a statute requiring parental consent before a minor may obtain an abortion was found to seriously invade privacy because it was more than an insignificant intrusion.  *Id*.

155.    As discussed above, the Court finds the Government severely invaded Su's privacy by providing gratuitous and salacious details about the federal investigation. Furthermore, as NASA was a party to the joint investigation (*see* Exh. 62), and NASA security improperly made disclosures during the investigation, the investigation itself was unreasonably intrusive on Su's personal life, a violation of Su's constitutional privacy rights distinct from the disclosures.  *See Noble v. Sears, Roebuck and Co.*, 33 Cal.App.3d 654, 660 (1973) (investigations that are unreasonably intrusive violate the California constitutional right to

privacy).

156.    In sum, Su had established privacy interests in the matters discussed, and a reasonable expectation of privacy.  Because the Government's disclosures represented severe invasions, the Court finds the United States liable for multiple invasions of Su's privacy.

The Government's Asserted Defenses Are Unavailing.

157.    The Government argues that it cannot be held liable for the disclosures at issue because (a) it had a legitimate competing interest in making the disclosures, or (b) the communications were protected by the state "common interest" privilege.

A.    *The Government Has Failed to Establish A Competing or Compelling Interest Sufficient to Justify the Invasions of Su's Privacy.*

158.    Under state law, a violation of privacy will not be found if the invasion of privacy is outweighed by other important interests.  *Hill, supra,* 7 Cal.4th at 34.

159.    As an initial matter, the parties disagree over the burden needed for defendant to establish a sufficient, countervailing interest.  Plaintiff contends defendant must show a "compelling interest" to justify an invasion of privacy and must also show an absence of an alternative means to serve that interest.  *See, e.g., White, supra*, 13 Cal.3d at 776.  The court in *Hill* analyzed its decision in *White* and found this test, as opposed to a less burdensome balancing test, applies where cases involve an obvious invasion of an interest fundamental to personal autonomy.  *Hill, supra,* 7 Cal.4th at 34.

160.    The Court finds the higher, "compelling interest" standard advocated by plaintiff applies in the present case because the violations constituted "misusing information gathered for one purpose in order to serve other purposes."  *White, supra,* 13 Cal.3d 774.  The compelling interest standard is also appropriate because defendants disclosed results of Su's polygraph test, and thereby invaded Su's personal autonomy.  *See id.* at 774 (recognizing privacy of thoughts and emotions).

161.    Based on the evidence presented at trial, the Court concludes the disclosures about Su constituted invasions of his personal autonomy.  Therefore, the compelling interest standard applies, and the Government must demonstrate a compelling interest in making the disclosures, as well as an absence of alternative means.  The Government has failed to meet both of these requirements.

162.    General co-worker morale or "a generalized interest in the integrity of the work

force" is not a compelling interest sufficient to justify a serious invasion of privacy.  *See American Federation of Labor v. Unemployment Ins. Appeals Bd.*, 23 Cal.App.4th 51, 66 (1994) ("A generalized interest in the integrity of the work force has not been found sufficient to overcome privacy interests in drug testing cases."); *Soroka v. Dayton Hudson Corp.*, 18 Cal.App.4th 1200, 1214 (1991) (generalized concern about employee fitness found "not sufficient to constitute a compelling interest, nor does it satisfy the nexus requirement.")

163.    Moreover, even if general employee morale were a compelling interest—and it is not—defendant cannot show the disclosures about Su had any value in advancing this interest. NPR 1600.1 is informative in this regard.  Under this regulation, if a contractor's badge is revoked, the employer is not to be informed of the basis for the revocation.  (Exh. 1022, NPR1600.1, section 4.9.6.2)

164.    Furthermore, even if the Court were to find the disclosures did not constitute invasions of interests fundamental to personal autonomy, and therefore implicate the lesser balancing standard, the defense is not availing.

165.    The competing interest defense involves the use of a balancing test that compares the specifically identified privacy interests of the plaintiff with legitimate, competing, and countervailing nonprivacy interests asserted by the defendant.  *Hill, supra,* 7 Cal.4th at 37–38 (applying test to NCAA drug testing program for student athletes and finding no violation due to the competing interests of safeguarding integrity of sports and protecting student health).  In balancing interests under the competing interest defense, the relative importance of an asserted interest depends on its proximity to the central functions of a particular public or private enterprise.  *Hill, supra,* 7 Cal.4th at 38.

166.    The disclosure to an employer of highly personal information contained in protected reports has been found unjustified under California law.  In *Pettus*, an employer retained a psychiatrist to evaluate an employee for disability leave, and the employer needed a detailed report to formulate a plan for getting the employee back to work as soon as possible. *Pettus, supra,* 49 Cal.App.4th at 445-446.  The Court found the employer's proclaimed interests did not outweigh the plaintiff's privacy interests.  *Id.*

167.    In addition, Su has rebutted defendant's competing interest assertion by showing there were feasible and effective alternatives to the defendant's conduct that would have a lesser

1   impact on privacy interests.  *Hill, supra,* 7 Cal.4th at 40.  Specifically, NPR 1600.1 provides

2   alternative procedures for general badge revocation which could have been followed in this case.

3   NPR 1600.1, and NID 13.1.2, expressly state that when an individual is denied a badge, the

4   employer is not to be informed of the basis for the denial.  (Exh. 1022)

5       168.   Thus, even if the Court were to apply the lower "competing interest" test, Su's

6   substantial interest in his privacy greatly outweighed general employee concerns, and the defense

7   is therefore unavailing.  Furthermore, as a separate ground, the defense is unavailing because the

    Government had a feasible, less invasive alternative to its course of action.

8       169.   Ultimately, the United States cannot satisfy the balancing test as it has failed to

9   identify a competing interest.  The United States put forth no evidence at trial to show that the

10  information was furnished for security reasons.  (*See* Dolci, 253:17-254:19 ("I did not believe

11  that Su posed a threat once he was debarred."); Silverman, 691:4-8 (Silverman had no concern

12  that Su might try to re-enter the NASA Ames premises after his badge was revoked))  Rather, the

13  United States argued at trial that the information was provided to improve employee morale.

14  UARC supervisor Jeff Myers, however, testified that Su's debarment did not impact the ability

15  of the UARC employees to complete their job responsibilities.  (Myers, 502:21-23)

16      170.   Because there was no compelling or competing interest in sharing the information

17  at issue, the defense does not protect defendant.  Moreover, even if there had been a compelling

18  or competing interest to protect—and there was not—the Government has not shown an absence

19  of alternative means to address such an interest, and NASA regulations illustrate alternative

    means that would not have violated Su's privacy.

20      B.  The Common Interest Defense In Unavailing.

21      171.   California Civil Code Section 47(c) provides a qualified privilege for

22  communications between interested persons. Specifically, the privilege protects communications:

23          to a person interested  therein, (1) by one who is also interested, or (2) by one who
24          stands in such a relation to the person interested as to afford a reasonable ground
            for supposing the motive for the communication to be innocent, or (3) who is
25          requested by the person interested to give the information.  Civ. Code § 47(c).

26      172.   The United States has the burden of proving that the statement was made on a

27  privileged occasion**.** *Kashian v. Harriman*, 98 Cal.App. 4th 892, 915 (2002) ("The defendant has

28

the initial burden of showing the allegedly defamatory statement was made on a privileged occasion . . . .").

173.   To be protected, the statement must be one "'reasonably calculated to further that interest.'" *Cuenca v. Safeway San Francisco Employees Federal Credit Union*, 180 Cal.App.3d 985, 995 (1986), quoting *Kelly v. General Telephone Co.*, 136 Cal.App.3d 278, 285 (1982). "The standard is one of reasonableness, not of necessity." *SDV/ACCI, Inc. v. AT&T Corp.,* 522 F.3d 955, 962 (9th Cir. 2008).  Once a foundation for the privilege is established, a plaintiff can rebut the presumption and defeat protection of the privilege with proof the statement was made with malice.  *Lundquist v. Reusser,* 7 Cal.4th 1193, 1208 (1994).

174.   Here, as a threshold matter, the United States has not carried its burden to show there was a cognizable interest in the subject matter.  The Government argues the statements were never made to begin with.  (*See* Dolci, 252:16-23 (stating it would have been foolish to identify Su as a security risk to his co-workers))  Moreover, NASA security acknowledged there was no concern that Su posed a security risk after debarment.  (Dolci, 253:17-254:19; Silverman, 691:4-8)  To the extent defendant claims the statements needed to be made for morale purposes, UARC manager Jeff Myers testified the debarment was not impacting the ability of the UARC employees to complete their job responsibilities.  (Myers, 502:21-23)

175.   The United States has not demonstrated that the statements at issue were reasonably calculated to further any interest, including morale.  *Deaile v. General Telephone Co. of California,* 40 Cal.App. 3d 841, 847 (1974) (to be protected by the privilege, the communication must be one reasonably calculated to further the common interest); *Gardner v. Shasta County*, 2007 U.S. Dist. LEXIS 81047, 11-17 (E.D. Cal. Nov. 1, 2007) ("Defendants have also not established that the allegedly defamatory statements made at various meetings consisted of matters material to the "interest sought to be protected."  [citation]  Although the general purpose of a particular meeting may provide privilege for communication consistent with that same goal, statements made in that meeting that are not relevant to that general end are not similarly privileged.")

176.   Furthermore, the common interest privilege has been found not to apply where, in disclosing the reasons behind a termination to employees, an employer engages in excessive publication or includes immaterial matters that do not have a bearing on the interest being

protected.  *Deaile*, *supra*, 40 Cal.App.3d at p. 846 ("inclusion of immaterial matter which have no bearing on the interest sought to be protected" may defeat the privilege); *SDV/ACCI, Inc., supra,* 522 F.3d at 962.  In *Payton v. City of Santa Clara*, 132 Cal.App.3d 152, 153-54 (1982), an employer wrote a memorandum addressed to plaintiff detailing the reasons for his termination and posted the document, without plaintiff's knowledge or consent, on the bulletin board in the employee break room that about 40 people used.  *Id*.  Similarly, here, the debarment letter and its contents were shared with Su's employer, and his co-workers were subsequently told, without his knowledge, that he was a security risk, and had taken money from another government and then denied it.

177.    In the present case, a particularly egregious factor was Su's inability to address the allegations against him in an effective way.  Because the statements were colored to the detriment of Su, and he had no meaningful opportunity to know what was said about him, to whom, and by whom, the invasions were particularly excessive.  See *Snively v. Record Publishing Co.,* 185 Cal. 565, 578 (1921) (*disapproved of on other grounds in Brown v. Kelly Broadcasting Co., et al.,* 48 Cal.3d 711 (1989)) (if the facts are exaggerated, overdrawn, or colored to the detriment of the plaintiff, or are not stated fully and fairly with respect to the plaintiff, the privilege may be lost).

178.    In *Cuenca, supra,* the plaintiff claimed he was defamed when his employer circulated written reports to the supervisory committee and board of directors stating that he was receiving kickbacks, incorrectly reporting his hours, and keeping irregular office hours.  *Cuenca, supra,* 180 Cal.App.3d 985, 996 (1986). While the court ultimately found that the disclosure at issue was afforded protection by the common interest privilege, it highlighted the fact that to be protected, the statement must be one reasonably calculated to further the protected interest.  In finding the privilege applied, the court stressed that the report was not widely distributed among employees, but was limited to members of the supervisory committee for approval and to the board of directors.  The *Cuenca* court also commented that the disclosure was only made to those who had a direct interest in the matter, as the statements concerned plaintiff's fitness as a manager.

179.    Relying on the principles espoused in *Cuenca*, the court in *Eastech Electronics v. E&S Intern. Enterprises, Inc.,* 2009 WL 322242, held that defendant, a distributor, abused the

common interest privilege by including inflammatory and irrelevant material that unreasonably disparaged plaintiff in a letter to a third party.  The court found that the letter contained "substantial gratuitous, false and negative information about Plaintiffs that went well beyond the response called for by [the third party's] payment inquiries," including statements that "[plaintiff] has continually failed to fulfill their commitments under the agreement," and that one client became "very upset" and "extremely aggravated" at some alleged failures of plaintiff. The court acknowledged that defendant was privileged in responding to the third party's payment inquiry and assumed the truth of defendant's assertions, however, ultimately the court felt that the statements went far beyond what was reasonable to protect the common interest.

180.    In addition, specific rules governing issues of privilege and privacy may prevail over general rules permitting discovery.  For example, in *Pettus, supra,* 49 Cal.App.4th at 438, the court found a psychiatrist's disclosure of personal medical information regarding an employee to the employer was not privileged under general privilege of communication between two interested parties, as that privilege was superseded by Confidentiality of Medical Information Act.  Dolci used NPR 1600.1 to determine policies and procedures he used in the work he did at NASA Ames.  He relied upon 1600.1 to determine what restrictions would be imposed on Su.  (Dolci, 264:7-16)  Dolci reviewed chapter 4 of NPR 1600.1 because section 1.4.1 did not provide information "on how to inform … the individual's supervisor."  That section "at least tells you how to provide information on the debarment to a supervisor."  (Dolci, 276:1-12)

181.    Even if any subject disclosures were otherwise covered by the common interest privilege—and they were not—if a communicator acts with malice, the statement is not protected by California Civil Code section 47(c).  *Kashian, supra,* 98 Cal.App.4th at 914-915, *citing Brown, supra,* 48 Cal.3d at 723, fn. 7.   In the context of an action for invasion of privacy, to determine whether there is malice, courts focus "on the defendant's attitude toward the plaintiff's privacy, not toward the truth or falsity of the material published."  *Cantrell v. Forest City Publishing Co*., 419 U.S. 245, 252 (1974).  No showing of ill will is required.  *See id*.  The deletion of a crucial fact could reflect an indifference to the impression being given to the recipient of the information and support an inference of malice. (See *Montandon v. Triangle Publications, Inc*., 45 Cal.App.3d 938, 948-949 (1975))

182. In this case, the United States showed a reckless attitude toward Su's privacy. Su called Dolci about the debarment, with questions about why it had happened. Dolci could not answer these types of questions. The phone call was uncomfortable for Dolci because Su was obviously upset. According to Dolci, Su was wondering "what was going on and why." Since Dolci could not answer, he decided to end the call. (Dolci, 242:1-243:12) Despite knowing Su's position that he was not aware of why he had been debarred, Dolci chose to tell his co-workers that Su knew why he had been debarred, implying that Su was both a security risk and a liar.

183. In addition, when the statements were communicated to Su's co-workers, there was no assurance Su would be able to remain employed with UARC, making them all the more reckless. Su was given a Notice of Termination on July 3, 2008. (Exh. 4) After debarment, NASA management objected to Su's continued employment. (Coffland, 531:15-20) Hogle recalls around January, 2009, individuals at NASA were surprised that Su was still working with UARC. (Hogle, 420:16-19) Hogle heard from Hipskind that the Center Director had "made the statement that he was surprised that Su was still an employee." (Hogle, 421:6-8)

184. Dolci told the UARC managers Su could no longer work on the UARC contract. Hogle wrote an email relaying that: "According to Bob, Haiping cannot be retained on the UARC contract." (Myers 486:11-13; Exh. 138) Myers testified it was his understanding at the time of debarment that, according to Dolci, Haiping could not be retained on the UARC contract. (Myers, 486:11-15) Hogle required that NASA give him something in writing before the University of California would terminate Su. (Coffland, 532:18-21)

185. Because the disclosures were not reasonably related to a legitimate interest, or were made with reckless disregard for Su's privacy, the common interest privilege does not apply.

<u>The Privacy Violations Caused Severe, Legally Cognizable Harm to Su</u>.

A. <u>*Su Suffered Severe Emotional Distress from the Privacy Invasions*</u>.

186. The Court credits the testimony of plaintiff, his wife Sharyn Su, and his colleagues as to the severe distress caused to him by the invasions of his privacy.

187. On July 3, 2008, Su met with Myers at a location off of the NASA Ames premises. It was at this meeting that Myers provided Su with a termination letter. (Su, 106:5-12, Exh. 4) At the same meeting, Su learned about the meeting held earlier that day by Dolci. When

Su heard about the meeting and the fact that UARC employees had attended, he was confused and crestfallen: he did not understand why such a meeting took place, especially when he himself did not know what was going on.  (Su, 108:23-109:22)

188.    Su felt helpless and became depressed and miserable.  (Sharyn Su, 762:16-763:7)  He had nightmares and began grinding his teeth.  (Sharyn Su, 763:15-764:1)  Due to his lack of sleep, he began drinking substantial amounts of coffee so he could stay awake and concentrate on his work.  (Sharyn Su, 765:16-23; 766:13-15)  He attributes the coffee as a way to cope with depression and focus on work to avoid thinking about the security risk determination.  (Su, 115:9-24)

189.    The Court finds the security risk disclosures caused Su severe emotional distress.  Su felt humiliated and, as a result, he lost his self-confidence.  (Sharyn Su, 767:4-10; 769:5-6)  Su believes that the term security risk means you are not good, that you are hiding something or that you are a spy.  (Su, 118:15-119:13)  When Su learned that people thought he took money from a foreign government, he was hurt and confused.  He worries that people think of him differently.  (Sharyn Su, 772:1-4)  Su believes that people think he is connected with taking something, that he is a bad guy.  (Su, 118:7-14)  Su is concerned that people think of him in that light.  (Su, 114:17-115:8; 118:15-119:13)  This is something Su believes you can never get rid of, something he has to live with for the rest of his life.  (Su, 118:15-119:13)

190.    The Court credits the testimony of Su and other witnesses that, before the disclosures, Su was very social with his coworkers, and his professional relationships were strong.  (Su, 50:13-16)  However, Su no longer fraternizes with his coworkers.  (Fegan, 564:4-12; Coffland, 517:24-25; 518:2; Myers, 471:14-16)  He has also lost interest in communicating with old friends and simply does not want to talk to them.  (Su, 116:3-15; 122:24-123:10; 123:20-124:6; Sharyn Su, 763:15-764:1; 764:22-765:5)  The statements about Su have caused him to remove himself from interactions with anyone outside the home.  (Sharyn Su, 767:4-10)  Su no longer trusts people and does not want to make any new friends because he does not think he can trust anyone.  (Sharyn Su, 768:3-8; 768:15-18)  Su no longer wants to see anyone and has completely isolated himself.  (Sharyn Su, 773:3-9; 765:12-13)

191.    The allegations against Su have not only affected Su's relationship with friends, coworkers, and the outside world, but have also affected his relationship with his family.  Su's

31

wife, Sharyn Su, said that Su cannot stop thinking about what happened, and has changed severely as a result.  (Su, 122:24-123:10)  Su no longer wants to be in situations where there are crowds because he does not want to see people.  (Sharyn Su, 764:12-21)  He no longer goes shopping with his wife and has not gone on a vacation since the events of June and July, 2008. (Su, 116:3-15; Sharyn Su, 764:12-21)  Su's lack of interest in all social interactions and hobbies has caused him to bury himself in his work.  (Sharyn Su, 765:14-15)

### B. <u>Su May Recover Damages For His Injuries.</u>

192.    The right of privacy fundamentally concerns one's own peace of mind and any injury flowing therefrom is mental and subjective.  *Operating Engineers Local 3 v. Johnson,* 110 Cal.App.4th 180, 187 (2003); *Selleck v. Globe Int'l, Inc.,* 166 Cal.App.3d 1123, 1135 (1985). An individual who has established a cause of action for invasion of that privacy is entitled to recover damages arising therefrom.  Restatement Second of Torts, section 652H.  In *Time, Inc. v. Hill,* 385 U.S. 374, 384, fn. 9 (1967), the court stated: "[i]n the 'right of privacy' cases the primary damage is the mental distress from having been exposed to public view, although injury to reputation may be an element bearing upon such damage."  *See Miller v. National Broadcasting Co.,* 187 Cal.App.3d 1463, 1484 (1986) (damages flowing from an invasion of privacy would logically include an award for mental suffering and anguish).  There is, however, a distinction between a cause of action for invasion of privacy and one for defamation.  The former "is not injury to the character or reputation but a direct wrong of a personal character resulting in injury to the feelings without regard to any effect which the publication may have on the property, business, pecuniary interest, or the standing of the individual in the community." *Selleck, supra,* 166 Cal.App.3d at 1135.

193.    It is well-established that the injury to one's peace of mind encompasses the emotional and mental distress suffered by virtue of an invasion of the right to privacy. Courts have recognized that this type of damage does not require actual out-of-pocket loss.  *Diaz v. Oakland Tribune, Inc.,* 139 Cal.App.3d 118, 137 (1983).  Mental and emotional distress damages can encompass feelings of anxiety, embarrassment, humiliation, shame, depression, powerlessness, and anguish, among others.  *Operating Engineers Local 3, supra,* 110 Cal.App.4th at 187; *see also Miller v. National Broadcasting Co.,* 187 Cal.App.3d 1463, 1485 (1986).  The resulting damage can also include "personal humiliation" and "mental anguish and

suffering." *Diaz, supra,* 139 Cal.App.3d at 137.  In *Miller, supra,* 187 Cal.App.3d at 1485, the court acknowledged that these types of damages are the subject of legitimate inquiry by a jury when the consequences and events which flowed from the actionable wrong are taken into consideration.

194.    The Government's violations of Su's privacy have caused Su severe mental and emotional distress.  As a result of the disclosures made by the Government to Su's colleagues, Su has experienced weight loss, sleep deprivation, inability to concentrate, helplessness, stress, nightmares, teeth grinding, headaches, humiliation, misery, depression, loss of self-confidence, decreased energy, and lack of a desire to experience things, which has caused him to withdraw from life.  (Su, 114:17-115:8; 115:9-24; Sharyn Su, 762:16-763:7; 772:14-18; 763:15-764:1; 765:16-23; 766:13-15; 767:4-10; 769:5-6)  Su has isolated himself from his colleagues and his friends.  He is no longer interested in socializing with colleagues and friends that he had and he certainly is not interested in meeting new people.  (Fegan, 564:4-12; Coffland, 517:24-25; 518:2; Myers, 471:14-16; Su, 116:3-15; 122:24-123:10; 123:20-124:6; Sharyn Su, 763:15-764:1; 764:22-765:5; 767:4-10; 773:3-9; 765:12-13)  Su no longer trusts people and does not want to make any new friends because he does not think he can trust anyone.  (Sharyn Su, 768:3-8; 768:15-18)

195.    The security risk determination and the disclosures have also affected Su's relationship with his family.  Su's wife, Sharyn Su, said that the security risk determination is something that Su cannot stop thinking about and Su has changed a lot as a result.  (Su, 122:24-123:10)  Su no longer wants to be in situations where there are crowds because he does not want to see people.  (Sharyn Su, 764:12-21)  He no longer goes shopping with his wife and has not gone on a vacation since the security risk determination.  (Su, 116:3-15; Sharyn Su, 764:12-21)  Su's lack of interest in all social interactions and hobbies has caused him to bury himself in his work.  (Sharyn Su, 765:14-15)

196.    The Government's actions have caused Su to become a different person.  Once a bright, intelligent, pleasant, and confident man, Su is now a man that feels like he has no future, someone whose career is ruined.  Su feels like if he lost his job, he couldn't find another one with this label of security risk.  (Sharyn Su, 767:15-19)  He knows that if he needs to find another job, he will have to disclose the fact of the security risk label.  (Su, 116:8-117:9)  This

has created uncertainty in Su's life, thereby adding to the mental and emotional distress suffered by Su. *Id.* Su believes that this security risk label and the things people now know about him are a fact of life that he can never get rid of, something he has to live with for the rest of his life. (Su, 118:15-119:13)

197.   The Court finds Su has sustained major and lasting emotional stress as a result of the disclosures at issue. The type of harm and distress exhibited by Su as a result of the Government's disclosures is precisely the type of harm courts have recognized as a basis for an award of sizeable damages in a case involving an invasion of privacy. A trial court has discretion in awarding damages in the nature of emotional and mental distress and such an award should take into consideration the facts and the evidence demonstrating the injury to the plaintiff. *People v. Smith* (2011) 198 Cal.App.4th 415, 435-436. This exercise of discretion is given further credence by the fact that no fixed standard exists for deciding the amount of damages for mental or emotional distress. CACI 1820; *Smith*, *supra,* 198 Cal.App.4th at 435. Su should thus be awarded the entirety of his requested relief.

### **Damages**

198.   Plaintiff is entitled to damages to be set by the Court for pecuniary losses, and future lost work, as well as intangible elements such as pain and suffering, both mental and physical; impairment of ability to work and labor; humiliation; embarrassment; fear of social ostracism; anxiety or worry attributable to the injury; and mental distress.

199.   The amount awarded by the Court for damages is $ _____.

200.   Plaintiff to be awarded fees and costs.

DATED:  January 23, 2014                    McMANIS FAULKNER

                                            _____/s/_____

                                            JAMES McMANIS
                                            MICHAEL REEDY
                                            TYLER ATKINSON
                                            NEDA SHAKOORI

                                            Attorneys for Plaintiff, DR. HAIPING SU

1

## **CERTIFICATE OF SERVICE**

2          I hereby certify that on January 23, 2014, I electronically transmitted the aforementioned

3  PLAINTIFF'S POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF

4  LAW to the Clerk of the Court's Office using the CM/ECF System for filing and transmittal of a

5  Notice of Electronic Filing to the following registrants:

6
                                    Joseph Steven Jarreau
7                                   Trial Attorney
                                    United States Department of Justice
8                                   Civil Division
                                    P.O. Box 888
9                                   Washington, DC 20044
                                    steven.jarreau@usdoj.gov
10

11                                  Vesper Mei
                                    Trial Attorney
12                                  United States Department of Justice
                                    Civil Division
13                                  P.O. Box 888
                                    Washington, DC 20044
14                                  vesper.mei@usdoj.gov

15

16

17

18

19

20

21

22

23

24

25

26

27

28