1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

8

**NORTHERN DISTRICT OF CALIFORNIA**

9

**SAN JOSE DIVISION**

10

11

HAIPING SU,

Case No.  5:09-cv-02838-EJD

Plaintiff,

12

v.

13

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

NATIONAL AERONAUTICS AND SPACE

14

ADMINISTRATION, et al.,

15

Defendants.

16

17

I.    **INTRODUCTION**

18

Plaintiff Haiping Su ("Su") claims that Defendant United States of America ("the United

19

States") deprived him of state constitutional privacy rights by disclosing to his employer,

20

colleagues, and coworkers the reasons for his debarment[1] from the NASA[2] Ames Research Center

21

("NASA Ames").  These findings of fact and conclusions of law follow a five-day bench trial.

22

23

---

[1] The parties use the term "debarment" to refer to the revocation of Su's access to NASA Ames.
UF 30.

24

25

The parties' Joint Final Pretrial Conference Statement identifies thirty-eight undisputed facts.  *See*
Joint Statement at 11-14, ECF 230.  With agreement of counsel and leave of the Court, Su's
counsel read the thirty-eight undisputed facts into the record on the first day of trial.  *See* Tr. 27-
32.  References to those facts are indicated by "UF" herein and references to the trial transcript are
indicated by "Tr."

26

27

28

[2] National Aeronautics and Space Administration.

United States District Court
Northern District of California

## II.     PROCEDURAL HISTORY

Su, an American citizen of Chinese ethnicity, is a scientist employed by the Regents of the University of California at Santa Cruz, University Affiliated Research Center ("UARC").  UARC is a NASA contractor.  At the time of the events giving rise to this lawsuit, Su was part of UARC's Earth Sciences Group that worked on-site at NASA Ames.  Following a joint investigation conducted by the Federal Bureau of Investigation ("FBI") and NASA, Su was debarred from NASA Ames.  Su was informed of the debarment by letter dated June 24, 2008 ("debarment letter"), which stated that Su's debarment was based upon a determination that his continued presence on NASA property constituted a security risk.  The debarment letter was hand-delivered to Su at NASA Ames and immediately thereafter he was escorted from the premises.  Su remains employed by UARC and has continued to work on the NASA/UARC contract from his home under a telecommuting agreement.

Su filed this lawsuit on June 24, 2009, asserting *inter alia* claims against NASA, the FBI, and officials of both agencies under the Administrative Procedure Act ("APA") and the Fifth Amendment of the United States Constitution.  Those claims were based upon alleged deprivations of Su's due process rights with respect to his debarment from NASA Ames.  Su also asserted deprivations of his privacy rights as protected by the federal Privacy Act, 5 U.S.C. § 552a, the United States Constitution, and the California Constitution.  Those claims were based upon Defendants' alleged disclosures of the reasons for Su's debarment to his coworkers and others.  The Court dismissed the Fifth Amendment claim and granted summary judgment for Defendants with respect to the APA claim.  It is important to note that those rulings disposed of all claims challenging the validity of the process by which Su was debarred from NASA Ames.

On January 15, 2010, Su filed a separate lawsuit[3] arising out of the same facts, asserting a claim against the United States under the Federal Tort Claims Act ("FTCA") for deprivations of his privacy rights as protected by the California Constitution.  Following consolidation of the

---

[3] Case No. 5:10-cv-00222.

United States District Court
Northern District of California

actions, Su filed the operative Corrected Consolidated Complaint[4], asserting the FTCA claim as well as claims for violation of the Privacy Act and deprivation of informational privacy rights guaranteed by the United States Constitution.  The Court granted summary judgment for Defendants as to the latter two claims, leaving only the FTCA privacy claim[5] against the United States for trial.

Having considered the admissible evidence and argument presented during the bench trial, and the parties' post-trial submissions, the Court makes the following Findings of Fact and Conclusions of Law:

## III.    FINDINGS OF FACT[6]

### A.    Su's Education and Employment

1.    Su was born in China and graduated from Zhejiang University with an agricultural degree.  UF 1.

2.    Su immigrated to the United States in 1986.  UF 2.

3.    In 1991, Su earned a Master's Degree and a Ph.D. in Agronomy/Remote Sensing from Kansas State University.  UF 3.

4.    Su is an American citizen.  UF 4.

5.    In 2002, Su began working as a senior data analyst for Sky Research, a subcontractor of Science Applications International, Inc. ("SAIC"), which was a NASA contractor.  Su worked on-site at the NASA Dryden Flight Research Center on Edwards Airforce Base.  UF 5, 19, 35.

6.    In 2005, NASA awarded a contract to UARC to provide the services previously provided by SAIC and its subcontractor, Sky Research.  UF 20.

_____

[4] ECF No. 127-1.

[5] *See* Consol. Compl. ¶¶ 102-119, ECF 127-1.

[6] During the five-day bench trial, thirteen witnesses testified, numerous exhibits were received into evidence, and 779 pages of transcript were generated.  The Court makes findings as to those facts relevant to adjudication of Su's privacy claim.  Some testimony and evidence necessarily is touched upon only briefly or is not touched upon at all.  The Court has, however, reviewed the entire transcript as well as its trial notes and the parties' post-trial submissions in preparing these Findings of Fact and Conclusions of Law.

United States District Court
Northern District of California

1      7.     Su and others left Sky Research and went to work for UARC. UF 6, 21.

2      8.     Su worked on-site at the NASA Ames premises at Moffett Field, California. He

3 provided support to NASA Ames' Earth Sciences Division, which uses "space observations as

4 well as measurements from aircraft," combined "with scientific understanding and modeling to

5 better understand what is going on, on the planet." Tr. 314:18-315:1 (Hipskind).[7] The

6 information gathered is used in civil earth sciences research, not for military applications. Tr.

7 315:2-6 (Hipskind). In particular, the UARC Earth Sciences Group builds and maintains aircraft

8 sensing instruments for NASA that are referred to as "facility instruments" in that they are used

9 "by the entire earth sciences community." Tr. 315:7-18 (Hipskind).

10      9.     Generally, NASA and UARC employees working in the Earth Sciences Division

11 are classified as "low risk," meaning that they have "little effect on the efficiency of the agency's

12 programs and operations." Tr. 319:21-320:2.

13      10.     Some of the Earth Sciences staff do have classified clearance. Tr. 319:3-320:2

14 (Hipskind). Moreover, although the Earth Sciences research generally uses publicly available

15 data, there is "sensitive but unclassified information" involved in writing proposals, and at times

16 there is classified work or other sensitive but unclassified work occurring in other divisions at

17 NASA Ames. Tr. 372:1-374:8 (Hipskind).

18      11.     Su worked only with publicly available information; he was not involved in writing

19 proprietary research proposals or other sensitive or classified work. Tr. 376:12-377:1 (Hipskind).

20      **B.     UARC Personnel**

21      The following individuals were employed by UARC at the time of Su's 2008 debarment:

22      12.     Jim Berry ("Berry") was the director of the UARC contract at NASA Ames. Tr.

23 326:24-327:1.

24      13.     Below Berry was Larry Hogle ("Hogle"), whose position was described during the

25

26 ───────────────

27 [7] When identification of the witness would be helpful in understanding the import or weight of the testimony, the Court identifies the witness in a parenthetical following the citation to the trial transcript. When the fact in question is undisputed or when the identity of the witness would not add to the analysis, no parenthetical is provided.

28

United States District Court
Northern District of California

trial as "associate director of the UARC contract," UF 34, "the general manager of UARC," Tr. 88:22-23, and "the functional lead" at UARC, Tr. 297:7-9.

14.     Next down the UARC chain of command was Jeff Myers ("Myers"), who was the task manager for the Earth Sciences Group at UARC and Su's direct supervisor.  Myers reported to Hogle.  UF 8; Tr. 461:25-462:10.

15.     Alvin Bruce Coffland ("Coffland") was an operations manager at UARC.  He reported directly to Myers and acted as Myers' deputy manager of UARC's Earth Sciences Group at NASA Ames.  Tr. 514:19-515:19.

16.     Su's coworkers at UARC included Patrick Grant (707:4-708:12), Roseanne Dominguez (Tr. 626:2-628:21), Sophie Fegan (Tr. 551:8-554:3), and Diane Gribschaw (Tr. 695:1-22).

**C.      NASA Personnel**

17.     Robert Dolci ("Dolci") was the Chief of Protective Services at NASA Ames.  UF 34.

18.     Kenneth Silverman was the Center Chief of Security at NASA Ames, reporting to Dolci.  Tr. 662:21-663:21.

19.     Reginald Waddell was a counterintelligence special agent assigned to NASA Ames as his duty station.  From 2004 to 2007 he reported to Dolci, but beginning on April 1, 2007 he reported to a supervisor based in Washington, D.C.  Tr. 599:10-600:20.

20.     Roderick Stephen Hipskind was the division chief of the Earth Sciences Division at NASA Ames.  Tr. 314:11-15.

**D.      FBI/NASA Joint Investigation**

21.     The FBI investigated and interviewed Su in 2004.  UF 10.

22.     On March 3, 2006, the FBI sent NASA a memorandum suggesting that Su posed "a potential threat to U.S. National Security" and requesting that NASA participate in a joint investigation of Su.  Pl.'s Ex. 62 (FBI Memo. dated Mar. 3, 2006).

United States District Court
Northern District of California

5

23.     The March 3, 2006 memorandum was provided to Waddell.[8]  Tr. 602:11-19 (Waddell).

24.     Waddell showed the March 3, 2006 memorandum to Robert Dolci ("Dolci"), Chief of Protective Services for NASA Ames.  Tr. 182:8-12, 183:18-184:18 (Dolci).

25.     NASA did participate in a joint investigation as requested by the FBI.  Tr. 605:20-606:11 (Waddell).

26.     Waddell kept Dolci informed about the joint investigation, which lasted until May 22, 2008.  Tr. 190:22-191:2 (Dolci).

27.     Dolci did not inform his NASA superiors of the potential threat posed by Su outside of the periodic counterintelligence briefings that occurred every few months.  He had no particular recollection of raising the March 3, 2006 memorandum or the joint investigation at such a briefing, but he assumes that the issue was raised.  Tr. 226:11-227:8 (Dolci).

28.     Dolci did not tell anyone at UARC about the March 3, 2006 memorandum or the potential threat posed by Su.  Tr. 227:11-15 (Dolci).

29.     The reason that Dolci did not inform others of the March 3, 2006 memorandum was that in his experience the "vast majority" of potential security problems turned out to be nothing.  He thought it was inappropriate to "get spun up or to spin someone else up" before waiting to see how things played out.  Tr. 228:4-7, 234:6-9 (Dolci).

30.     FBI agent Sherman Kwok ("Kwok") and Waddell interviewed Su four times during

---

[8] The relevance of Waddell's testimony generally and of the 2006 investigation in particular was the subject of spirited argument at several points during the trial.  *See* Tr. 441:15-459:4, 589:11-598:8.  The Court initially indicated that it was inclined to sustain the United States' relevance objection to evidence regarding the 2006 investigation.  Tr. 456:16-457:5, 459:6-17.  Su's counsel argued that the March 2006 FBI memorandum and Waddell's testimony regarding the 2006 investigation were relevant to the United States' common interest and competing interest defenses.  Specifically, counsel argued that the evidence undercuts the United States' position that at the time of debarment there was a strong interest in excluding Su from NASA Ames as a security risk, because the FBI had informed NASA that Su posed a security risk two years prior in 2006 and no action was taken then.  Tr. 455:25-8.  The Court ultimately was persuaded that evidence regarding the 2006 investigation was relevant for the limited purpose articulated by Plaintiff's counsel, but not for the purpose of challenging the reliability or adequacy of the investigation.  Tr. 575:8-20, 589:23-590:11, 596:25-2.  The Court admitted the March 3, 2006 FBI memorandum without objection from the United States and permitted Waddell to testify about it briefly.  Tr. 605:20-606:11.

United States District Court
Northern District of California

2008.  On one of those occasions, March 21, 2008, Su underwent a consensual polygraph examination.  UF 10-11; Joint Ex. 1015 (FBI Memo. dated May 22, 2008); Tr. 610:8-16 (Waddell).

31.      Su told a number of his coworkers that he was under investigation and/or that he had taken a polygraph examination.  He told Myers and Coffland that he had been interviewed by the FBI after the first interview in 2008.  Tr. 125:19-25 (Su).  He also told Myers and Coffland that he had taken a polygraph examination and "did not do well" on it.  Tr. 128:12-17 (Su).  Myers told Hipskind that Su had taken a polygraph.  Tr. 368:24-369:6.  Su discussed the polygraph examination at a meeting attended by Hogle, Coffland, Ed Scheffner,[9] and Esther Sylvan.[10]  Tr. 126:22-127:9 (Su).  He told Fagan – his coworker, landlord, and friend – that he had taken a polygraph.  Tr. 128:2-8 (Su).  Fegan told Dominguez, another coworker, that Su had taken a polygraph.  Tr. 659:4-9 (Dominguez).

32.      Dolci told Hogle prior to the debarment and Coffland after the debarment that Su had a problem with one particular polygraph question.  Hogle testified that when he discussed the ongoing investigation with Dolci prior to Su's debarment, Dolci stated that "Haiping knows what this is about" and "needs to be open and honest so that it can be resolved."  Tr. 414:1-6 (Hogle).  According to Hogle, Dolci indicated that "whatever this issue was that Dr. Su knew about it and all they wanted him to do was to answer truthfully a particular question."  Tr. 414:9-11 (Hogle).  Coffland testified that Dolci made a similar statement to him – that Su had a problem with a particular polygraph question – after the debarment.  Tr. 526:9-15 (Coffland).  Dolci testified that he "was pretty confident" that he did not tell Hogle or Coffland that Su had trouble with a question on the polygraph.  Tr. 220:5-221:6 (Dolci).  The Court finds the testimony of Hogle and Coffland to be more credible on this point.  The fact that both men recall having a similar conversation with Dolci is persuasive.  Moreover, Dolci's testimony was not definite – he stated only that he was "pretty confident" that he did not make the statements in question.  Accordingly, the Court finds

---

[9] Ed Scheffner was Hipskind's deputy.  Tr. 320:23-25.

[10] Esther Sylvan was a UARC human resources manager.  Tr. 89:9-10.

United States District Court
Northern District of California

1    that Dolci did make the statements described by Hogle and Coffland.

2         33.     On May 22, 2008, the FBI sent NASA a memorandum stating that the results of the

3    polygraph were "indicative of deception"; that Su "further denied any undisclosed contacts with

4    foreign nationals seeking his professional assistance"; and that there was "a reasonable belief" that

5    Su "may present a threat to national security."  The memorandum recommended "that NASA

6    independently consider taking precautionary measures regarding SU's access to the U.S.

7    Government facility and information in order to address existing security concerns that SU has

8    been unwilling to clarify." UF 12-16; Joint Ex. 1015 (FBI Memo. dated May 22, 2008).

9         34.     Dolci received the memorandum on the same day it was prepared, May 28, 2008.

10   Tr. 224:8-20 (Dolci).

11   **E.**     **Debarment**

12        35.     Dolci had authority to debar Su immediately, but he chose to wait until he could

13   confer with his direct supervisor and the Center Director, who was away from NASA Ames.  Tr.

14   225:1-18 (Dolci).  Dolci weighed the risk of waiting several weeks to remove Su against the need

15   for the removal to be a joint decision that included the Center Director, and felt the risk was

16   acceptable.  Tr. 225:19-226:10 (Dolci).

17        36.     Dolci drafted the June 24, 2008 debarment letter revoking Su's access to NASA

18   Ames.  The letter stated that, "This order is made pursuant to NASA Procedural Requirement

19   (NPR) 1600.1, Section 1.4.1.[11] based upon a determination that your continued presence on

20   NASA property constitutes a security risk."  Joint Ex. 1010 (Debarment Letter).

21        37.     Dolci handed the letter to Silverman[12] with directions to deliver it to Su, escort Su

22

23   [11] Section 1.4.1 provided that:

24   Center Directors, Headquarters Operations Director, the AA/OSPP, the DSMD, or the CCS, shall
     order the removal or debarment of any person who violates NASA Security requirements or

25   whose continued presence on NASA property constitutes a security or safety risk to persons or
     property.  Any determinations to reconsider granting access subsequent to the removal action must

26   receive the concurrence, in writing, of the AA/OSPP.

27   Joint Ex. 1022 (NPR 1600.1, § 1.4.1 (2005)).

28   [12] Before Silverman was called as a witness, the United States objected on the ground that he
     would not be able to offer any relevant testimony.  Tr. 444:14-23.  The Court concluded that

United States District Court
Northern District of California

8

from NASA Ames, and provide a copy of the letter to Berry.  Tr. 236:5-8.  Silverman testified that Dolci did not give him any instructions as to who should or should not receive a copy of the debarment letter.  Tr. 669:4-670:11 (Silverman).  However, Silverman also testified that after escorting Su off the NASA Ames premises, he did mail a copy of the debarment letter to Berry.  Tr. 672:2-6 (Silverman).  The Court finds Dolci's testimony on this point to be more credible in light of the fact that Silverman in fact sent a copy of the letter to Berry.

38.  After receiving the letter from Dolci and before delivering it to Su, Silverman called Larry Hogle to tell him what was about to happen, and went to Hogle's office to speak with him.  Silverman testified that it was customary to notify an employee's supervisor about "what is going to happen" to the employee.  Tr. 670:12-20 (Silverman).

39.  Myers was present in Hogle's office when Silverman arrived, or came to Hogle's office shortly thereafter.  Tr. 670:24-671:5 (Silverman); Tr. 474:13-23 (Myers).

40.  Silverman spent about ten minutes with Hogle and Myers going over the terms of the debarment letter, and he gave Hogle a copy of the letter.  Tr. 671:9-672:8, 674:17-675:3 (Silverman).

41.  Hogle, Myers, and a protective services employee named Dirk Meier accompanied Silverman to Su's office.  Silverman gave Su ten or fifteen minutes to collect his belongings before escorting him from the premises.  Tr. 672:9-20, 673:6-9 (Silverman); Tr. 476:23-477:6 (Myers); Tr. 94:22-95:18 (Su).

**F.  July 3, 2008 Meeting**

42.  After Su's debarment, Myers was asked many questions by Su's colleagues as to why Su was no longer working at NASA Ames.  UF 32.

43.  Hipskind advised Pete Worden, the NASA Ames Center Director, that the entire Airborne Science Technology Lab was upset about the debarment.  UF 33.

44.  Hogle advised Dolci that a meeting with Su's colleagues was necessary to address their questions about the debarment.  UF 34.

---

Silverman would have relevant testimony regarding delivery of the debarment letter to Su and the process of Su's debarment, and permitted his testimony as to those areas.  Tr. 450:8-15.

United States District Court
Northern District of California

United States District Court
Northern District of California

45. On July 3, 2008, Dolci convened a meeting that included Su's UARC coworkers and NASA colleagues in the Earth Sciences Division.  UF 18.

46. It is unclear from the record exactly how many people attended the meeting.  The estimates from attendees range from 10-15 people, Tr. 655:15-17, to 20-30 people, Tr. 16-19, to 30-50 people, Tr. 481:1-2.

47. The meeting lasted between fifteen and thirty minutes.  Tr. 249:23-250:4 (Dolci); Tr. 740:18-19 (Grant).

48. Dolci did most of the talking at the meeting.  Tr. 481:11-12 (Myers); Tr. 734:21-23 (Grant); Tr. 697:1-5 (Gribschaw).

49. Hipskind spoke briefly,[13] just to state that he was aware of the reasons for the debarment and supported Dolci.[14]  Tr. 255:11-25 (Dolci); Tr. 350:19-24 (Hipskind).

50. Dolci informed the attendees that Su was debarred because he was a security risk.  A number of attendees recall Dolci making such a statement.  Tr. 481:11-15 (Myers); Tr. 716:16-24 (Grant); Tr. 656:4-6 (Dominguez); 697:12-16 (Gribschaw).  Dolci testified that he did not recall stating at the meeting that Su was a security risk, and that it would have been "incredibly foolish" for him to have made such a statement.  Tr. 252:16-253:3 (Dolci).  The Court credits the testimony of the several employees who recalled Dolci's statement that Su was a security risk.

51. Dolci also said that Su's debarment was the result of something he did in a prior job.  Tr. 481:15-22 (Myers); Tr. 722:16-21 (Grant).

52. Dolci told the assembled staff that one way to avoid Su's fate was not to take money from a foreign government and then deny it.  Tr. 352:1-11 (Hipskind); 482:1-14 (Myers); Tr. 524:14-19 (Coffland). [15]  Dolci testified that he did not make this statement.  Tr. 222:1-12

---

[13] After review of the record, the Court finds the testimony of Dolci and Hipskind to be more credible than the conflicting testimony of other witnesses who stated that Hipskind took a more active role at the meeting.

[14] After Hipskind wrote a strongly worded email to the Center Director regarding Su's debarment, Dolci arranged for Hipskind to be granted a special short-term security clearance so that he could be briefed on the reasons for the debarment.  Tr. 244:14-248:25 (Dolci).

[15] Myers testified that he could not recall whether Dolci or Hipskind gave the admonition not to take money from a foreign government.  Tr. 482:7-14.  Coffland thought Hipskind had made the

United States District Court
Northern District of California

(Dolci).  However, the Court credits the accounts of the witnesses who testified that the statement was made.  The statement also is corroborated by Dominguez's testimony that Dolci implied that Su's debarment had something to do with contact with foreign nationals.  Tr. 660:4-10 (Dominguez).

The Court also finds that the statement was intended to suggest, and did suggest, that *Su* had taken money from a foreign government.  The United States argues that any such statement was a hypothetical and was taken as such.  *See* Tr. 352:5-16 (Hipskind); Tr. 510:22-511:6 (Myers).  However, the statement was made during a discussion of why *Su* had been debarred.  It was in response to expressions of concern by employees that they might suffer the same fate.  *See* Tr. 352:1-11 (Hipskind).  No other hypothetical examples of ways to avoid Su's fate were given.  *See* Tr. 511:14-16 (Myers).  At least some of those present at the meeting understood Dolci to be saying that Su had taken money from a foreign government.  *See* Tr. 511:17-512:1 (Myers).  After the July 3 meeting, Fagen asked Su's wife whether Su had taken money from the Chinese government.  Tr. 761:9-19 (Sharyn Su).  Fagen said that NASA officials had told staff that at a meeting.  Tr. 761:17-19 (Sharyn Su).  After the July 3 meeting, it was generally understood among the UARC staff that Su was debarred because he had received money from a foreign government and concealed it.  Tr. 507:16-22 (Myers).

53.  Dolci did not use the phrase "FISA regulation" during the July 3 meeting.  The only evidence that Dolci used this phrase is Grant's notation in his daytimer; Grant does not have a specific recollection of Dolci using the phrase.  Tr. 718:21-719:20 (Grant); Pl.'s Ex. 137 (Grant's Notes).  Dolci testified that he did not use the phrase.  Tr. 292:8-17 (Dolci).  No one else at the meeting had a recollection of Dolci using the phrase "FISA regulation."  *See, e.g.,* Tr. 368:12-14 (Hipskind); Tr. 368:7-14 (Hipskind).

54.  Dolci referred to the badging process during the July 3 meeting.  It is unclear in what context such a reference was made; Grant's daytimer bears the notation "HSPD-12"[16] and

---

statement.  Tr. 524:18-19.  After reviewing the testimony of all witnesses who were at the meeting, the Court finds that Dolci made the statement.

[16] HSPD-12 was the Homeland Security Presidential directive requiring increased security for all

11

"OPM."  Tr. 718:1-17 (Grant); Pl.'s Ex. 137 (Grant's Notes).

      **G.**     **Su's Post-Debarment Employment**

    55.    Following his debarment, Su received a Notice of Intent to Terminate from Myers, dated July 3, 2008.  Pl.'s Ex. 4.  The notice informed Su that he would be terminated effective July 11, 2008.  *Id.*

    56.    On July 17, 2008, Myers sent Su a Rescindment of Notice of Intent to Terminate. Pl.'s Ex. 5.  That correspondence informed Su that he could continue working for UARC via a telecommuting agreement.  *Id.*

    57.    Su continues to work for UARC.  He has not suffered any break in service or loss of earnings.  He has not lost any employment-related benefits.  He has received annual merit salary increases.  Tr. 136:15-25 (Su).

    58.    Su has suffered mental and emotional distress since his debarment from NASA Ames.  He has trouble sleeping, loses concentration, has begun grinding his teeth, is depressed, gets headaches, and drinks more coffee.  Tr. 114:19-117:9, 119:14-121:9 (Su); Tr. 762:16-766:15 (Sharyn Su).  These symptoms are partially caused by being labeled a security risk and partially caused by being debarred.  Tr. 137:17-140:10 (Su).  Su is not able to separate the mental and emotional distress that he feels as a result of debarment from the mental and emotional distress he feels as a result of the privacy deprivations asserted in this case.  Tr. 145:24-146:9 (Su).  Su's wife has observed many changes in him since the debarment and July 3 meeting, including a decreased interest in normal life activities, teeth grinding, trouble sleeping, weight loss, and depression.  Tr. 762:16-765:13 (Sharyn Su).

    59.    Su has not sought medical treatment for his emotional distress or other symptoms. Tr. 122:13-23, 137:1-13 (Su).  When he has a headache, he takes Tylenol.  Tr. 123:5-7 (Su).

---

federal employees.  It was implemented by requiring all federal employees to submit new badging applications.  Tr. 164:11-165:15.  Every federal employee was required to complete a new form, the Electronic Questionnaire for Investigation Processing ("e-QIP").  Tr. 165:25-167-3, 213:21-22.

## IV.   CONCLUSIONS OF LAW

### A.   Legal Standard

60.   The elements of a privacy claim under the California Constitution are: "(1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy." *Hill v. Nat'l Collegiate Athletic Assoc.*, 7 Cal. 4th 1, 39-40 (1994). "Whether a legally recognized privacy interest is present in a given case is a question of law to be decided by the court." *Id.* at 40. "Whether plaintiff has a reasonable expectation of privacy in the circumstances and whether defendant's conduct constitutes a serious invasion of privacy are mixed questions of law and fact." *Id.*

61.   "A defendant may prevail in a state constitutional privacy case by negating any of the three elements just discussed or by pleading and proving, as an affirmative defense, that the invasion of privacy is justified because it substantively furthers one or more countervailing interests." *Hill*, 7 Cal. 4th at 40. "Plaintiff, in turn, may rebut a defendant's assertion of countervailing interests by showing there are feasible and effective alternatives to defendant's conduct which have a lesser impact on privacy interests." *Id.* "The existence of a sufficient countervailing interest or an alternative course of conduct present threshold questions of law for the court." *Id.* "The relative strength of countervailing interests and the feasibility of alternatives present mixed questions of law and fact." *Id.* In applying the competing interest privilege, courts must keep in mind that "[a] plaintiff's expectation of privacy in a specific context must be objectively reasonable under the circumstances, especially in light of the competing social interests involved." *Id.* at 26-27. The California Supreme Court has described the privilege as follows:

> Legitimate interests derive from the legally authorized and socially beneficial activities of government and private entities. Their relative importance is determined by their proximity to the central functions of a particular public or private enterprise. Conduct alleged to be an invasion of privacy is to be evaluated based on the extent to which it furthers legitimate and important competing interests.

*Id.* at 38.

62.     Additionally, California's statutory common interest privilege may constitute a defense to a privacy claim.  *See* Cal. Civ. Code § 47(c).  California Civil Code section 47(c) provides in relevant part that:

> A privileged publication or broadcast is one made . . . [i]n a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information.  This subdivision applies to and includes a communication concerning the job performance or qualifications of an applicant for employment, based upon credible evidence, made without malice, by a current or former employer of the applicant to, and upon request of, one whom the employer reasonably believes is a prospective employer of the applicant.

Cal. Civ. Code § 47(c) (emphasis added).  In general, "a communication is presumed to be privileged where it is made in the context of an employee relationship."  *Van Hull v. County of Monterey*, No. C-95-20494-JW, 1996 WL 225012, at *7 (N.D. Cal. 1996).

63.     Application of the common interest privilege is a two-step process.  First the defendant must make an initial showing that a particular statement falls within the common interest privilege.  *Kashian v. Harriman*, 98 Cal. App. 4th 892, 915 (2002).  If the defendant makes that showing, the burden shifts to the plaintiff to show that the defendant made the statement with malice.  *Id.*  "Malice for purposes of the statute means a state of mind arising from hatred or ill will, evidencing a willingness to vex, annoy or injure another person."  *Id.* (internal quotation marks and citations omitted).[17]

**B.     Alleged Deprivations of Privacy Rights**

In his closing brief, Su asserts eight separate deprivations of his privacy rights, discussed in turn as follows:

---

[17] Su argues that a different standard applies, citing *Cantrell v. Forest City Pub. Co.*, 419 U.S. 245, 251-52 (1974).  *Cantrell* addressed the malice standard in the context of a common law false-light privacy claim under the laws of Ohio or West Virginia; it did not address the California statutory common interest privilege at issue in this case.

14

**64.     Deprivation 1:  Dolci's Pre-Debarment Statements to Hogle Indicating that Su Refused to Answer One Question on the Polygraph**

Su asserts a deprivation of privacy rights resulting from Dolci's pre-debarment statement to Hogle indicating that Su had refused to answer one question on the polygraph, and Dolci's related statements to Hogle about the polygraph.

The Court finds that Dolci did make the statements.  Findings of Fact ("FF") 32.  Su had a legally protectable interest in the details of a law enforcement investigation of him.  *See Hunt v. FBI*, 972 F.2d 286, 288 (9th Cir. 1992) (holding, in the context of a FOIA case, that "[a] government employee generally has a privacy interest in any file that reports on an investigation that could lead to the employee's discipline or censure."); C*f. United States Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 780 (1989) ("we hold as a categorical matter that a third party's request for law enforcement records or information about a private citizen can reasonably be expected to invade that citizen's privacy").

However, the Court concludes that under the particular circumstances of this case, Su did not have a reasonable expectation of privacy with respect to the details of the polygraph examination.  "A 'reasonable' expectation of privacy is an *objective* entitlement founded on broadly based and widely accepted community norms."  *Hill*, 7 Cal. 4th at 37 (emphasis added).  "[T]he plaintiff in an invasion of privacy case must have conducted himself or herself in a manner consistent with an actual expectation of privacy, *i.e.*, he or she must not have manifested by his or her conduct a voluntary consent to the invasive actions of defendant."  *Hill*, 7 Cal. 4th at 26.  Su told at least six individuals that he had taken a polygraph, and (foreseeably) some of those individuals told others.  *See* FF 31.  Su's conduct was not consistent with an expectation of privacy.  Su characterizes his own disclosures about the polygraph as "limited," and argues that his own disclosures were not sufficient to erode his expectation of privacy.  That argument is unpersuasive given the number of people Su confided in and his choice to disclose more than the *fact* of the polygraph when he told Myers and Coffland that he "did not do well" on the examination.  FF 31.  Under those circumstances, it would have been objectively unreasonable for Su to expect that the details of the polygraph would remain private.  *See Pettus v. Cole*, 49 Cal.

United States District Court
Northern District of California

App. 4th 402, 448-89 (1996) (if the plaintiff himself has disclosed the private information, "he will be hard pressed to claim any legally protected 'privacy' interest with respect to that information").

Moreover, even if Su did have a reasonable expectation of privacy with respect to the details of the polygraph, Dolci's disclosures did not go so far beyond Su's own disclosures as to constitute a serious invasion of privacy.  "Actionable invasions of privacy must be sufficiently serious in their nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right."  *Hill*, 7 Cal. 4th at 37.  Given the disclosures that Su made, Dolci's addition of details regarding the polygraph did not constitute "an egregious breach of social norms."

**65.    Deprivation 2:  Silverman's Delivery of a Copy of the Debarment Letter to Hogle**

Su asserts a deprivation of privacy rights resulting from Silverman's delivery of a copy of the debarment letter to Hogle.  The Court finds that Silverman did give Hogle a copy of the debarment letter.  FF 40.  As discussed above, the debarment letter stated among other things that "[t]his order is made pursuant to NASA Procedural Requirement (NPR) 1600.1, Section 1.4.1. based upon a determination that your continued presence on NASA property constitutes a security risk."  Joint Ex. 1010 (Debarment Letter).  Silverman had a legally protected privacy interest in the debarment letter.  *See Hunt*, 972 F.2d at 288 ("[a] government employee generally has a privacy interest in any file that reports on an investigation that could lead to the employee's discipline or censure."); *see also Kimberlin v. Dep't of Justice*, 139 F.3d 944, 949 (9th Cir. 1998) (censured Assistant United States Attorney had privacy interest "in avoiding disclosure of the details of the investigation, of his misconduct, and of his punishment").

However, any expectation that such a letter would not be disclosed to Su's UARC supervisors would have been objectively unreasonable.  Obviously, NASA Ames had to offer UARC an explanation for revoking its employee's access privileges.  The letter did not provide any details of the FBI investigation – it simply recited the bare bones language of NPR 1600.1, section 1.4.1 (providing for debarment of any person whose "continued presence on NASA

16

property constitutes a security or safety risk"). *See* Joint Ex. 1010 (Debarment Letter).  Under the circumstances, the letter offered the most minimal explanation possible for Su's removal.

Even if it were persuaded that Hogle's receipt of the debarment letter resulted in a deprivation of Su's privacy rights, the Court would conclude that any such deprivation was subject to the common interest privilege.  *See* Cal. Civ. Code 47(c).  As discussed above, "a communication is presumed to be privileged where it is made in the context of an employee relationship."  *Van Hull*, 1996 WL at *7.  Given UARC's status as a NASA contractor, and the fact that the UARC Earth Sciences Group worked on-site at the secure NASA Ames facility, it was entirely reasonable for NASA Ames to inform Su's supervisors that he had been deemed a security risk.  Nothing in the records suggests that Silverman gave the debarment letter to Hogle for malicious purposes.

### 66.   Deprivation 3:  Dolci's Post-Debarment Statement to Coffland that Su had a Problem with the Polygraph

Su asserts a deprivation of privacy rights resulting from Dolci's post-debarment statement to Coffland that Su had a problem with a particular question on the polygraph.  The Court finds that Dolci did make the statement.  FF 32.  Su had a legally protectable interest in the details of the joint FBI/NASA investigation of him.  *See Hunt,* 972 F.2d at 288; *see also Kimberlin*, 139 F.3d at 949.  However, this privacy claim fails for the same reasons as the claim resulting from Dolci's other statements regarding the polygraph.  *See* Conclusion of Law ("CL") 64.

### 67.   Deprivation 4:  July 3 Meeting Statements of Dolci and Hipskind to the Effect that Su was a Security Risk

Su asserts a deprivation of privacy rights resulting from disclosure of his status as a "security risk" by Dolci and Hipskind at the July 3 meeting.  The Court finds that Dolci did most of the talking at the meeting, and that Hipskind spoke only briefly to state that he was aware of the reasons for the debarment and supported Dolci.  FF 48-49.  The Court finds that Dolci did state that Su had been debarred because he was a security risk.  FF 50.  Su had a legally protectable interest in the investigatory determination that he was a security risk.  *See Hunt,* 972 F.2d at 288; *see also Kimberlin*, 139 F.3d at 949.

The Court concludes that Su had a reasonable expectation that the security risk determination resulting from the joint FBI/NASA investigation would not be broadcast widely. While Su should have known that NASA would have to communicate the security risk determination to his supervisors as a practical matter, he had no reason to expect that determination to be announced at a large staff meeting containing as many as fifty of his colleagues.  *See* FF 46 (between 10-50 people attended the July 3 meeting).  Dolci's announcement constituted a serious invasion of Su's privacy.

However, the Court concludes that the common interest privilege applies.  *Deaile v. General Telephone Co. of Cal.*, 40 Cal. App. 3d 841 (1974), is instructive.  In *Deaile*, the reasons for the plaintiff's forced retirement were announced at a supervisors' meeting, and the supervisors were instructed to relay the information to other employees if they had questions.  *Id.* at 846.  The state appellate court held that the common interest privilege set forth in California Civil Code § 47(c) applied, noting that all of the recipients of the information worked at the same facility, which the plaintiff had managed, or were the plaintiff's superiors.  *Id.*  The court found that "the factors surrounding plaintiff's forced retirement were only disseminated in an effort to preserve employee morale and job efficiency.  Under these circumstances the recipients, as well as defendant, were 'interested' persons within the meaning of section 47."  *Id.*  Similarly, the evidence in this case shows that the individuals who worked in the Earth Sciences Division were very concerned about Su's abrupt departure.  They wanted to know what had happened to Su because he was their friend and colleague, and they also were worried about their own jobs.  *See* Tr. 251:19-252:13 (Dolci). The statement that Su had been deemed a security risk addressed those concerns.  Nothing in the record suggests that Dolci acted from hatred or ill will, or for the purposes of vexing, annoying, or injuring Su.

The Court concludes that the competing interest[18] defense applies as well.  Su had been

---

[18] Plaintiff argues that a "compelling interest" test applies rather than the "competing interest" test. Plaintiff contends Dolci's failure to take any action when he first learned that Su was considered a security risk in 2006, and decision to wait several weeks before debarring Su once the investigation concluded in 2008, undercuts any suggestion that there was a "compelling" reason to tell Su's colleagues that he was a security risk.  Even if Plaintiff were correct with respect to the appropriate test, the Court concludes that the United States did have a compelling interest in

United States District Court
Northern District of California

deemed a security risk, and he had many friends and colleagues who still worked at NASA Ames. While Su himself did not handle classified or sensitive material, others on the premises did.  FF 10-11.  It was entirely reasonable for NASA to inform the Earth Sciences Division staff that Su was now considered a security risk.  Plaintiffs point to Dolci's testimony that he did not view Su as a security risk once he had been debarred.  *See* Tr. 253:4-22.  Dolci's testimony assumed that Su would not be able to access NASA Ames post-debarment, and his belief that Su no longer was a threat was based upon that assumption.  *See id.*  However, the Court concludes that it was objectively reasonable to believe that Su could have had post-access to the NASA Ames premises, or information discussed thereon, through his colleagues.  Under those circumstances, the competing interest privilege applies.

> **68.**   **Deprivation 5:  July 3 Meeting Statements of Dolci that Su Posed a Security Risk based upon Something that had Happened in his Previous Employment**

The Court concludes that a much closer question is presented by Dolci's statement that the security risk determination arose out of Su's prior employment.  Su had a legally protectable interest in the investigatory determination that he had done something during his prior employment to render him a security risk.  *See Hunt,* 972 F.2d at 288; *see also Kimberlin*, 139 F.3d at 949.  The Court further concludes that Su had a reasonable expectation that the investigatory findings would not be widely publicized, and Dolci's statement at the July 3 meeting constituted a serious invasion of his privacy rights.  *See* FF 51.

Whereas Dolci's statement to the Earth Sciences Division staff that Su was a "security risk" clearly was covered by the common interest and compelling interest privileges, the application of those privileges is less clear with respect to the more detailed explanation that Su had been deemed a security risk *because of* conduct occurring during his prior employment.  Ultimately, the Court concludes that the common interest applies.  Other scientists and staff that

---

informing Su's colleagues that he was a security risk and had been debarred from the NASA Ames premises.  While one might take issue with Dolci's decision not to "get spun up or to spin someone else up" until the investigation of Su was final, *see* FF 29, there can be no question that once the investigation *was* final, the United States had a compelling interest in ensuring that Su's colleagues did not inadvertently give him access to a restricted government facility where sensitive and classified work was done.

United States District Court
Northern District of California

1   had been working closely with Su understandably were worried about the impact of his debarment

2   on themselves.  *See* Tr. 251:11-15.  An explanation that Su's debarment did not arise out of

3   anything he was working on at NASA Ames – and thus did not arise out of anything the remaining

4   employees were working on – falls within the common interest privilege.  And, as noted above,

5   nothing in the record suggests that Dolci acted with malice with respect to his statements at the

6   July 3 meeting.

7       **69.    Deprivation 6:  July 3 Meeting Suggestion by Dolci that Su had Taken Money**

8             **from a Foreign Government and Denied it.**

9       The most difficult issues presented by this case relate to Su's privacy claim based upon

10  Dolci's statement that one way to avoid Su's fate was not to take money from a foreign

11  government and then deny it.  The Court finds that Dolci did make the statement.  FF 52.  The

12  Court also finds that the statement was intended to suggest, and did suggest, that *Su* had taken

13  money from a foreign government.  *Id.*  Based upon the FBI documents that Dolci had seen during

14  the course of the investigation, which referenced Su's involvement with a foreign government, the

15  statement appears to be a disclosure (rather than, say, a fabrication).  *See, e.g.,* Joint Ex. 1015 (FBI

16  Memo. dated May 22, 2008).  Under the authorities and the reasoning set forth above, Dolci's

17  disclosure of that investigatory finding constituted a serious violation of Su's privacy rights.

18      Moreover, the Court concludes that this particular statement is not covered by the common

19  interest or competing interest privilege.  Unlike the statements that Su was a security risk and that

20  the debarment arose from his prior employment, the statement regarding a foreign government

21  was not legitimate explanation or advice.  It was not a statement that would "preserve employee

22  morale and job efficiency."  *Deaile*, 40 Cal. App. 3d at 846.  In fact, as described at trial, the

23  statement was delivered rather flippantly.  Dolci already had informed the Earth Sciences Division

24  in general terms why Su had been debarred and allayed their concerns that the debarment might

25  have arisen from work they themselves were still performing.  The Court concludes that there was

26  no legitimate purpose served by revealing that Su had taken, or at least was suspected of taking,

27  money from a foreign government.

28      Accordingly, the Court concludes that Su has established a deprivation of his privacy

United States District Court
Northern District of California

20

1   rights arising from Dolci's statement regarding taking money from a foreign government.

2   Appropriate damages for that deprivation are discussed below.

3      **70.    Deprivation 7:  July 3 Meeting Reference to a FISA Regulation by Dolci**

4      Su asserts a privacy deprivation based upon Dolci's reference to "FISA" during the July 3

5   meeting.  According to Su, that reference was to the Foreign Intelligence Surveillance Act.  Su has

6   not connected the dots for the Court to explain why a reference to that act would constitute a

7   deprivation of Su's privacy.  In any event, the Court finds that Dolci did not refer to FISA at the

8   July 3 meeting.  FF 53.

9      **71.    Deprivation 8:  July 3 Meeting Statements of Dolci Regarding the Badging**

10      **Process**

11      Su asserts a privacy deprivation based upon Dolci's reference to the badging process

12   during the July 3, 2008 meeting.  The Court finds that Dolci did refer to the badging process.  FF

13   54.  However, it is entirely unclear in what context such a reference was made.  Grant's daytimer

14   notations, "HSPD-12" and "OPM," do not suggest, let along prove, that information from Su's e-

15   QIP application was disclosed.  *See* Pl.'s Ex. 137 (Grant's Notes).

16      The lack of information with respect to any disclosure of Su's e-QIP application is

17   particularly telling in light of the significant amount of trial time that Plaintiff's counsel spent

18   eliciting testimony regarding NASA's badging process and, in particular, the HSPD-12 program

19   and the e-QIP application.  *See, e.g.*, Tr. 61:8-76:20 (Su); Tr. 164:5-168:5, 174:24-181:6, 207:12-

20   (Dolci).  The Court has never understood the relevance of that line of inquiry.  The evidence

21   shows that Kwok may have used a ruse when he interviewed Su in 2008, specifically, that he may

22   have led Su to believe that the questions asked were follow-up on Su's e-QIP application rather

23   than an investigation of him as a potential security risk.  Tr. 83:6-14 (Su).  Su and others initially

24   believed that the FBI's investigation was to clear up something to do with the badging process.

25   Tr. 84:15-24; 88:22-90:10 (Su).  And in fact Kwok may have used information from Su's e-QIP

26   application in the FBI investigation.  Tr. 265:16-25; Tr. 619:18-21.  What is missing from the

27   record is any evidence that the FBI's use of such a ruse or of Su's e-QIP application  was

28   improper.  Likewise missing is any evidence that Dolci disclosed information from Su's e-QIP

United States District Court
Northern District of California

21

application at the July 3 meeting.

### C.     Damages

As discussed above, Dolci's statement regarding taking money from a foreign government constituted a serious deprivation of Su's privacy rights.  Su was not present at the meeting, and it is unclear whether anyone ever told him precisely what Dolci said.  However, the record shows that he discovered the gist of the statement shortly after the July 3 meeting when his former coworkers started asking whether he had taken money from a foreign government.  *See* Tr. 117:23-118:14 (Su); Tr. 761:9-762:15 (Sharyn Su).  The question is what damages flowed from that deprivation.  Su continues to work for UARC.  He has not suffered any break in service or loss of earnings.  He has not lost any employment-related benefits.  He has received annual merit salary increases.  He has not incurred any medical expenses.  Accordingly, he has not suffered any pecuniary loss.  FF 57-58.

Su nonetheless may recover damages for emotional distress – anxiety, embarrassment, humiliation, shame, depression, feelings of powerlessness, and anguish – caused by the disclosure. *See Miller v. Nat'l Broadcasting Co.*, 187 Cal. App. 3d 1463, 1485 (1986).  Those damages flow from "a direct wrong of a personal character resulting in injury to the feelings without regard to any effect which the publication may have on the property, business, pecuniary interest, or the standing of the individual in the community."  *Operating Engineers Local 3 v. Johnson*, 110 Cal. App. 4th 180, 187 (2003) (internal quotation marks and citation omitted).  "One whose right of privacy is unlawfully invaded is entitled to recover substantial damages, although the only damages suffered by him resulted from mental anguish."  *Miller*, 187 Cal. App. 3d at 1485 (internal quotation marks and citation omitted).

Su testified among other things that he has trouble sleeping, loses concentration, has begun grinding his teeth, is depressed, gets headaches, and drinks more coffee.  FF 58.  His testimony was supported by that of his wife, who described the profound effect that the events at NASA Ames has had on Su.  FF 58.  Her impression is that he has lost interest in normal life activities such as seeing friends, going on vacation, and going shopping; he has become isolated and withdrawn.  FF 58.  Su requests damages in the amount of $5,267,648.57.

United States District Court
Northern District of California

1       Even if the Court were inclined to award damages in the amount requested by Su, the

2  Court could not do so here because Su testified that he *cannot separate* the mental and emotional

3  distress that he feels as a result of the asserted privacy deprivations from the mental and emotional

4  distress he feels as a result of the *debarment*.  FF 58.  All of Su's claims challenging the

5  debarment itself have been dismissed from this action.  To the extent that Su testified that he

6  suffered mental distress flowing from the asserted privacy deprivations, he focused on the

7  disclosure that he was a *security risk*; for the reasons discussed above, that disclosure either did

8  not constitute a deprivation of Su's privacy rights or it was privileged.

9       At trial, Su testified as follows:

10
        Q.      SO YOU HAVE EXPERIENCED STRESS AS A RESULT OF BEING
                DEBARRED?
11      A.      CORRECT.
        Q.      AND HAVE YOU LOST SLEEP BECAUSE YOU WERE DEBARRED?
12      A.      CORRECT.
        Q.      AND DO YOU EXPERIENCE HEADACHES BECAUSE YOU WERE
13              DEBARRED?
        A.      CORRECT.
14      Q.      DO YOU LOSE CONCENTRATION BECAUSE YOU WERE
                DEBARRED?
15      A.      YES.
        Q.      DO YOU EXPERIENCE DEPRESSION BECAUSE YOU WERE
16              DEBARRED?
        A.      THAT'S A COMBINATION OF THE DEBARRED AND SECURITY
17              RISK.  AS A SECURITY RISK THERE ARE ALWAYS THINGS
                HANGING OVER MY HEAD.
18      Q.      MY QUESTION WAS, HOWEVER, DO YOU EXPERIENCE
                DEPRESSION BECAUSE YOU WERE DEBARRED?
19      A.      CORRECT.

20      *****

21      Q.      DID YOU FIND IT PAINFUL BECAUSE YOU WERE DEBARRED?
        A.      YES.
22      Q.      DO YOU TRY TO STOP THINKING ABOUT WHAT HAPPENED AS A
                RESULT OF BEING DEBARRED?
23      A.      I TRY.
        Q.      AND HAVE YOU CHANGED AS A RESULT OF BEING DEBARRED?
24      A.      I HAVE CHANGED.
        Q.      AND HAVE YOU EXPERIENCED EMOTIONAL STRESS BECAUSE
25              YOU WERE DEBARRED?

26      A.      CORRECT.

27      *****

28

23

United States District Court
Northern District of California

1
2
3
4
5
6

Q.     DO YOU GRIND YOUR TEETH BECAUSE OF THE FACT THAT YOU
       WERE DEBARRED?
A.     YES.
Q.     AND ARE YOU A DIFFERENT PERSON TODAY BECAUSE YOU
       WERE DEBARRED?
A.     YEAH, I'M THINKING THAT WAY.
Q.     AND ARE YOU LESS SOCIAL BECAUSE YOU WERE DEBARRED?
A.     YES.
Q.     AND DO YOU INTERACT LESS WITH PEOPLE BECAUSE YOU
       WERE DEBARRED?
A.     YES.

7    Tr. 138:1-140:10 (Su).  Based upon Su's testimony, it is apparent that Su would have suffered all

8    the symptoms of which he complains solely because of the debarment, *even if the privacy*

9    *deprivation had never occurred*.

10          The July 3, 2008 disclosure to Su's coworkers that he took money from a foreign

11   government may well have caused Su to suffer mental distress in addition to the distress that he

12   already was suffering as a result of the June 24, 2008 debarment.  However, Su has not presented

13   any expert opinion or other evidence establishing that he did suffer such additional distress or

14   suggesting how such additional distress should be valued.  The Court thus is left with the choice of

15   awarding nominal damages or attempting to award damages in a vacuum.

16          Nominal damages would be appropriate if the Court were to conclude that Su did not

17   suffer a material injury as a result of the disclosure regarding taking money from a foreign

18   government.  "Nominal damages are awarded to a plaintiff where the evidence shows a breach of

19   duty owed to him or an invasion of his legal rights, without showing that he has thereby sustained

20   a material injury." *Fairfield v. Amer. Photcopy Equip. Co.*, 138 Cal. App. 2d 82, 87 (1955).  "A

21   judgment for nominal damages must always involve a trivial sum.  Such damages are damages in

22   name only and not in fact; they are the same as no damages at all." *Id.* at 87-88.

23          However, if the Court were to conclude that Su did suffer material injury from the

24   disclosure, in addition to the injury resulting from the debarment and the other disclosures made at

25   the July 3 meeting, the case law suggests that the Court should attempt to assess such damages

26   even in the absence of direct evidence.  In a privacy action in which "there can be no direct

27   evidence of the amount of damages sustained, nor the amount of money which will compensate

28   for the injury. . . [t]he measure of damages . . . is for the trier of fact, and in assessing such

United States District Court
Northern District of California

1   damages he is accorded a wide and elastic discretion." *Fairfield*, 138 Cal. App. 2d at 88.

2           The Court's decision is rendered more difficult by the fact that Su always has maintained

3   that he did not know why he had been accused of taking money and did not know why he had

4   been debarred.  The disclosure that Su took money from a foreign government is actionable as an

5   invasion of his privacy rights only if it is a *disclosure* of an investigatory finding.  The Court

6   previously has clarified that Su may not recover on a theory that Dolci's statements were untrue

7   and therefore portrayed him in a false light.  *See* ECF 216 at 19.

8           After careful consideration of the record, the Court finds that Su discovered the statement

9   about taking money from a foreign government shortly after the July 3 meeting and that it is not

10  unreasonable to find that he suffered some additional mental distress arising from that statement

11  even though he already was suffering mental distress arising from the debarment.  Because Su did

12  suffer some injury, he is entitled to compensation.  In considering what that compensation should

13  be, the Court has attempted to weigh the important privacy interest at stake against the evidence

14  that Su already was suffering terribly by the time he learned that, in addition to everything else, his

15  coworkers had been told, in essence, that he took money from a foreign government.  Whether that

16  statement is true or not, it does appear to be a disclosure of an investigatory finding and therefore

17  it constituted a deprivation of Su's privacy rights.  The Court finds that Su is entitled to an award

18  of $10,000 for that deprivation.

19  **V.   DISPOSITION**

20          The Court hereby finds and concludes that Plaintiff has demonstrated a deprivation of his

21  privacy rights as discussed herein, and that in compensation for that deprivation Plaintiff shall be

22  awarded damages in the amount of $10,000.

23          IT IS SO ORDERED.

24

25  Dated:  September 25, 2014

26                                                  _____
                                                    EDWARD J. DAVILA
27                                                  United States District Judge

28